[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 22, 2011
JOHN LEY
CLERK

_____

No. 11-10694

_____

D.C. Docket No. 3:09-cv-00403-MMH-JRK

JOY PERRY,
d.b.a. Freedom Through Christ Prison Ministry,
d.b.a. Prison Pen Pals, and
WRITEAPRISONER.COM.INC.,
a Florida Corporation

Plaintiffs - Appellants,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
WARDEN, UNION CORRECTIONAL INSTITUTION,
WARDEN, FLORIDA STATE PRISON,
WARDEN, LOWELL CORRECTIONAL INSTITUTION,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 22, 2011)

Before MARCUS, WILSON, and COX, Circuit Judges.

WILSON, Circuit Judge:

This case concerns the constitutionality of the Florida Department of Corrections' (FDOC) Pen Pal Solicitation Rule. Joy Perry, who operates two pen pal services, and WriteAPrisoner.com, Inc. (WAP), brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the Rule violates the First and Fourteenth Amendments to the Constitution. Appellants seek to enjoin FDOC officials from banning all pen pal–solicitation correspondence between the entities that Appellants operate and Florida inmates. They argue that the Rule substantially burdens their programs and deprives them of due process. We affirm the district court because we find that the FDOC Rule is rationally related to a legitimate penological interest and that the FDOC did not violate Appellants due process rights.

I.

Perry operates two pen pal services: Freedom Through Christ Prison Ministry and Prison Pen Pals. Appellant WriteAPrisoner.com, Inc. is also a pen pal service. Each service solicits pen pals for prisoners and nonprisoners by sending a list of inmates seeking pen pals to individuals or groups who also seek a pen pal. The services will also send a list of nonprisoners to inmates seeking pen

2

pals. Neither of Perry's companies charges a fee for this service. WAP charges

$40 per year to permit inmates to place a pen pal advertisement on its website.

WAP also provides non–pen pal services to inmates such as access to educational

materials, a complimentary online resume posting service, and a program that

grants scholarships to children of inmates or victims of crimes.

In 2004 the FDOC adopted a rule that prohibits inmates from soliciting pen

pals, which states:

> Inmates shall not use correspondence privileges to solicit or otherwise
> commercially advertise for money, goods, or services. For the purposes
> of this rule this includes advertising for pen-pals; inmates are not
> prohibited from corresponding with pen pals, but shall not place ads
> soliciting pen pals. Inmates who post ads or have ads posted with the
> assistance of another person shall be subject to disciplinary action.

FLA. ADMIN. CODE ANN. r. 33-210.101 (9) (2004). The FDOC enacted this Rule

to prevent inmates from using pen pal–solicitation services to defraud people.

Although the FDOC does not cite any specific instances of fraud within Florida,

the district court found the testimony of a former FDOC employee and anecdotal

evidence from newspaper reports throughout the country persuasive evidence of

this fraudulent activity. The FDOC also discussed prison security as an

additional rationale behind the policy in the affidavit of James Upchurch, Chief of

Security Operations for the FDOC. Since the FDOC enacted the Rule, all of

Appellants' correspondence to inmates has been returned, including correspondence regarding the non–pen pal oriented services that WAP offers.

Despite the Rule, the FDOC has permitted a pen pal service, Christian Pen Pals, to continue to contact inmates. The FDOC permits Christian Pen Pals to operate because Christian Pen Pals, unlike Appellants's services, only provides one-to-one matching between noninmates and inmates. Mr. Upchurch alleges that this difference significantly decreases the likelihood of scams because an inmate does not receive a list with numerous individuals' names, addresses, and contact information.

In their Second Amended Complaint, Appellants claimed violations of their right to free speech, as protected by the First and Fourteenth Amendments, and their right to due process under the Fifth and Fourteenth Amendments. The district court granted the FDOC's motion for summary judgment on all counts, and Appellants timely filed their appeal.

"We review *de novo* the district court's grant of summary judgment and use the same standard of review utilized by the district court." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). Summary judgment is proper only if there is no genuine dispute as to issues of material fact.

FED. R. CIV. P. 56(c). We also review all evidence and inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).

## II.

As an initial matter, we address Perry's standing to bring her claims. The district court properly held that Perry has a legally protected interest in correspondence sent to an inmate. The Supreme Court held that both inmates and noninmates have a First Amendment interest in correspondence sent to one another. *Procunier v. Martinez*, 416 U.S. 396, 408–09, 94 S. Ct. 1800, 1809 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874 (1989). Furthermore, *Thornburgh* held that publishers have a First Amendment right to access prisoners, 490 U.S. at 408, 109 S. Ct. at 1879, and defined publications to include materials "addressed to a specific inmate [such] as advertising brochures," *id.* at 404 n.4, 109 S. Ct. at 1877 (quoting 28 C.F.R. § 540.70(a)). Because all of Appellants' mail has been banned by the FDOC, their interest as publishers in accessing prisoners has been harmed.

## III.

Resolution of the First Amendment issue depends upon determining which

5

standard to apply to speech in prisons. The Supreme Court, through a series of cases, endorsed two possible standards for First Amendment cases involving the free speech of prisoners and nonprisoners attempting to contact prisoners. The first of these cases is *Martinez*, which held that censorship of prisoner mail is justified if (1) the regulation furthers "an important or substantial governmental interest unrelated to the suppression of expression," and (2) "the limitation of First Amendment freedoms [is] no greater than is necessary . . . to the protection of the particular governmental interest." 416 U.S. at 413, 94 S. Ct. at 1811.

However, the cases that follow *Martinez* erode the high standard it set and, instead, show greater deference to prison administrators. *Pell v. Procunier*, decided a few months after *Martinez*, held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974). Thus, restrictions on journalists' ability to interview inmates face-to-face furthered legitimate penological objectives because "security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders." *Id.* at 827, 94 S. Ct. at 2806. In *Jones v. North Carolina Prisoners' Labor Union, Inc.*, the Court used the standard set forth in *Pell* and recognized

6

the "wide-ranging deference to be accorded the decisions of prison administrators." 433 U.S. 119, 126, 97 S. Ct. 2532, 2538 (1977).

In *Bell v. Wolfish*, the Court synthesized its case law to develop four general principles: (1) prisoners do not forfeit all constitutional protections, (2) retention of certain constitutional rights does not mean that the rights "are not subject to restrictions and limitations," (3) maintaining institutional security and order are "essential goals that may require limitation" of certain rights, and (4) prison administrators "should be accorded wide-ranging deference." 441 U.S. 520, 545–47, 99 S. Ct. 1861, 1877–78 (1979). Using this guidance, the Court found that limiting the sources that could mail hardback books to prisoners to only publishers, bookstores, or book clubs was a "rational response" to a clear security problem, because hardback books could be used to smuggle contraband into the prison. *Id.* at 550–51, 99 S. Ct. at 1880.

In *Turner v. Safley*, the Supreme Court considered regulations on inmate-to-inmate correspondence and inmate marriages. 482 U.S. 78, 81, 107 S. Ct. 2254, 2257 (1987). After thoroughly discussing its precedent, the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S. Ct. at 2261. The Court also set out a series of factors gleaned

7

from *Pell*, *Jones*, and *Bell* to help courts in determining the reasonableness of a regulation: (1) whether there is "a valid, rational connection between the regulation and the prison legitimate governmental interest;" (2) "whether there are alternative means of exercising the right;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources;" and (4) "the existence of obvious, easy alternatives[, which] may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89–90, 107 S. Ct. at 2262 (citations and internal quotation marks omitted). Using these factors, the Court upheld the regulations on inmate-to-inmate correspondence but rejected the regulation on inmate marriages. *Id.* at 81, 107 S. Ct. at 2257. Finally, the Supreme Court limited *Martinez* to regulations involving only outgoing mail and held that regulations affecting the sending of mail to prisoners be analyzed under the standard established in *Turner*.[1] *Thornburgh*, 490 U.S. at 413–14, 109 S. Ct.

---

[1]The Court specifically stated:

> [W]e acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. . . . [O]utgoing correspondence was the central focus of our opinion in *Martinez*. The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials. Any attempt to justify a similar categorical distinction between incoming correspondence from prisoners . . . and incoming correspondence from nonprisoners would likely prove futile . . . . To the extent that *Martinez* itself suggests such a distinction, we today overrule that case . . . .

8

at 1881–82.

Although two standards exist to determine when a violation of the First Amendment occurs within the prison context, the *Martinez* standard was only applied once by the Supreme Court—in *Martinez* itself. Since *Martinez*, the Court has always applied a more rationally based scrutiny to decide whether the First Amendment is violated within the prison context. We recognized the evolution of the *Martinez* standard toward rational basis review in *Lawson v. Singletary*, 85 F.3d 502, 511 (11th Cir. 1996) (per curiam).

Perry and WAP argue that *Martinez* granted them a right to not only send mail to inmates but also receive mail *from* inmates, but this reading of *Martinez* is too broad. *Thornburgh* requires application of the *Turner* reasonableness standard when the regulation at issue affects the sending of a publication to a prisoner, and the FDOC Rule affects that type of correspondence. *Thornburgh*, 490 U.S. at 413, 109 S. Ct. at 1881 ("[W]e now hold that regulations affecting the sending of a publication . . . to a prisoner must be analyzed under the *Turner* reasonableness standard." (internal quotation marks omitted)). Moreover, the outgoing correspondence in this case is distinguishable from the correspondence

---

*Thornburgh*, 490 U.S. at 413–414, 109 S. Ct. at 1881–82.

9

in *Martinez*. The personal correspondence in *Martinez* "did not, by its very nature, pose a serious threat to prison order and security." *Thornburgh*, 490 U.S. at 411, 109 S. Ct. at 1880. Here, Mr. Upchurch's affidavit states that the outgoing correspondence poses a direct threat to internal prison security because pen pals might give money to prisoners who will then use it to bribe officials and order hits on other inmates. Therefore *Turner*, not *Martinez*, is the appropriate standard in this case.

*Turner* sets out a four-factor analysis to determine if a prison regulation limiting the First Amendment is reasonably related to a legitimate penological interest. The first factor requires a rational connection between the prison regulation and the legitimate penological objective. *Turner*, 482 U.S. at 89, 107 S. Ct. at 2262. Appellants concede that protecting the public and ensuring internal prison security are legitimate penological objectives. Instead, they argue that the Rule does not rationally relate to the governmental interest because the FDOC has not provided evidence to prove that its Rule will protect the public or increase prison security. They rely on a Ninth Circuit case, *California First Amendment Coalition v. Woodford*, to establish that prison administrators must provide evidence that the asserted claims are true. 299 F.3d 868, 880 (9th Cir. 2002). Even if we were bound by this articulation, the FDOC meets this standard

by offering expert testimony to establish that the Rule will help curb pen pal scams. While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," the court is required to defer to the prison administrator's decisions and opinions. *Turner*, 482 U.S. at 84–85, 107 S. Ct. at 2259. The FDOC stated through James Upchurch's affidavit that when inmates only receive pen pals through personal associates and not pen pal companies (like Appellants' companies), the possibility of the inmate defrauding the pen pal is greatly reduced. Therefore, the FDOC has shown a rational relationship between the legitimate penological interests of protecting the public and ensuring internal prison security and the Rule prohibiting inmates from soliciting for pen pals.

The second factor requires us to decide if there are alternative avenues for exercising the right. *Id.* at 90, 107 S. Ct. at 2262. Appellants argue that there are no alternative avenues to market any of their services because the FDOC banned all of their correspondence. However, the FDOC stated that if WAP differentiates its non–pen pal services from the pen pal services by indicating the program on the return address, the FDOC will permit the non–pen pal service mailings to reach inmates. Moreover, the Rule does not prohibit inmates from corresponding with pen pals; rather, it only prohibits inmates from *soliciting* pen

11

pals. The FDOC leaves open alternative means for inmates to correspond with noninmates and for organizations to reach inmates through one-to-one pen pal correspondence. Perry and WAP could offer one-to-one matching and the FDOC presumably would permit such correspondence.

The next factor requires the court to evaluate the impact on guards, inmates, and prison resources. *Id.* at 90, 107 S. Ct. at 2262. Appellants argue that permitting their companies to advertise for inmates will not greatly affect the FDOC resources or prison guards and will, instead, help inmates in their rehabilitation by providing them contact with the outside world. The FDOC counters by showing that accommodating Appellants' bulk mailings would lead to an increase of mail, and this increase would burden prison staff by requiring them to comb through a significant portion of mail to catch any scams or contraband. James Upchurch states in his affidavit that the FDOC currently processes roughly 50,000 pieces of mail daily. Thus, a significant increase in mail would require the FDOC to shift correctional staff to review the increased volume of mail and to shift inspectors to investigate possible pen pal scams. This burden would make it more difficult for the already overworked staff and inspectors to accomplish their other responsibilities in ensuring a safe and secure prison environment. Furthermore, inmates may still have pen pal relationships

and may still glean the positive influence from pen pals, provided they use a one-to-one matching service.  Thus, the FDOC has satisfied the third *Turner* factor.

Finally, the court must decide whether the rule is an exaggerated response by looking at possible alternative means to prevent pen pal scams.  *Thornburgh*, 490 U.S. at 418, 109 S. Ct. at 1884.  Appellants argue that there are already several Florida statutes and FDOC rules that can prohibit pen pal scams without prohibiting the solicitation of pen pals because the rules and statutes set out how an inmate may correspond with a noninmate.  *See, e.g.*, FLA. STAT. § 817.031 (providing venue of prosecution under FLA. STAT. § 817.03, which prohibits making a false statement to obtain property or credit);  FLA. ADMIN. CODE ANN. r. 33-210.101(5) (allowing all routine mail correspondence to be opened, examined, and read to determine if the contents facilitate criminal activity).  Appellants also point to existing statutes and rules limiting the amount of money an inmate may possess at any given time to address the FDOC's argument that pen pal scams will hurt internal security by increasing the amount of money in the prison.  *See, e.g.*,  FLA. STAT. §  944.516 (permitting the FDOC to establish a rule limiting the amount in each inmate's trust account); FLA. ADMIN. CODE ANN. r. 33-602.201 (prohibiting inmates from possessing checks, credit cards, debit cards, or other

negotiables). However, the FDOC argues that these rules were insufficient to protect the public and prohibit inmates from receiving contraband. Steve Arnold, a former employee of the FDOC who worked in jails for fifteen years, stated in his affidavit that during his six years as an inspector he uncovered approximately one hundred pen pal scams. In addition, James Upchurch stated in his affidavit that WAP had been used in Arkansas to defraud the public through a pen pal scam. Although the FDOC did not need to narrowly tailor its Rule to only prohibit inmates from soliciting for pen pals, the FDOC chose to use the least exaggerated response possible. The choice to permit inmates to still have pen pals shows that the FDOC rule is a well reasoned response to a significant problem.

Applying the *Turner* factors to this case, it is clear that all four factors weigh in favor of the FDOC; therefore, the district court's granting of summary judgment for the FDOC was proper.

## IV.

*Martinez* states that both prisoners and their correspondents have a liberty interest in uncensored communication by letter; therefore, any decision to censor or withhold delivery of letters must be accompanied by procedural safeguards.

14

*Martinez*, 416 U.S. at 417–18, 94 S. Ct. at 1814. The FDOC argues that *Thornburgh* limited *Martinez*'s application to only outgoing mail for both the standard of scrutiny to evaluate a First Amendment violation and the procedural due process requirements. The district court doubted Appellants' liberty interest but declined to decide the issue because it found that Appellants failed the requirements stated in *Martinez*.

Appellants do have a liberty interest in accessing inmates. The Supreme Court has advised that "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad." *Bd. of Regents v. Roth*, 408 U.S. 564, 572, 92 S. Ct. 2701, 2707 (1972). Moreover, *Thornburgh* explained that publishers (including advertisers) have a First Amendment right to access inmates. 490 U.S. at 408, 109 S. Ct. at 1879. Thus, Appellants' First Amendment right to access inmates give them a liberty interest in seeing that their advertisements reach the inmates.

Like the First Amendment analysis above, we must first determine which standard to apply. Both the district court and the FDOC failed to properly read *Thornburgh*'s limitation of *Martinez*. *Martinez* was only limited as to the proper standard to use when analyzing a First Amendment claim within the prison context. *Thornburgh* did not discuss the standard for procedural due process,

except to thoroughly lay out the safeguards created by the particular regulations in question and declare that the regulations properly "provide[d] procedural safeguards for both the recipient and the sender." 490 U.S. at 406, 109 S. Ct. at 1878. As such, procedural safeguards must exist to ensure that Appellants can appeal any decision by the FDOC to block their advertisements.

*Martinez* created a three-part test to decide whether there are proper procedural safeguards for correspondence of a personal nature.[2] Here, Appellants' only send bulk correspondence to advertise their services to inmates. Thus, while *Martinez* may still control for due process claims where a prison limits personal correspondence, it is not necessary to require such a high standard for mass mailings.

Since mass mailings require a lower standard for due process guidelines, we evaluate what process is due under the test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976). To evaluate a due process claim we analyze three factors:

---

[2] Those safeguards are: (1) the inmate must receive notice of the rejection of a letter written by or addressed to him; (2) the author of the letter be given "reasonable opportunity to protest that decision," and (3) "complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Martinez*, 416 U.S. at 418–419, 94 S. Ct. at 1814.

16

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S. Ct. at 903 (citation omitted). Appellants do not have a compelling private interest in ensuring that their advertisements reach the inmates. As we have discussed above, the FDOC's interest in protecting the public and maintaining prison security is important.

Finally, we acknowledge that the risk of an erroneous deprivation of Appellants' private interest is high because the FDOC's enforcement of its Rule deprives WAP of the ability to send inmates advertisements concerning non–pen pal services. However, WAP can separate and distinguish its mail to inmates to eliminate any such concerns. Also, like Christian Pen Pals, Appellants are free to correspond with FDOC officials to challenge the denial of their advertisements. Any additional procedures would put an extra burden on the FDOC without necessarily adding any extra protections for Appellants. Therefore, the FDOC ensured that Appellants were afforded constitutionally required due process.

We affirm the district court order granting summary judgment in favor of the Florida Department of Corrections.

17

**AFFIRMED.**