[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14446
_____

D.C. Docket No. 1:10-cv-02084-AT


WASEEM DAKER,

Plaintiff - Appellant,

versus

NEIL WARREN,
Sheriff, Cobb County,
COBB COUNTY,

Defendants - Appellees.

_____

No. 14-10096
_____

D.C. Docket No. 1:10-cv-02084-AT


WASEEM DAKER,

Plaintiff - Appellant,

versus

SHERIFF, COBB COUNTY,
COBB COUNTY,

Defendants – Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(August 22, 2016)

Before JORDAN and FAY, Circuit Judges, and WALKER,[*] District Judge.

PER CURIAM:

Cobb County, through its Sheriff's Office, operates the Cobb County Adult

Detention Center, a facility which holds between 1800 to 2400 inmates, including

pretrial detainees.  During the time period relevant to this case, Neil Warren was

the elected Sheriff of Cobb County, and set and approved policies for CCADC.

Waseem Daker, a Georgia prisoner, filed a federal lawsuit under 42 U.S.C.

§ 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C.

§ 2000cc-1 *et seq.*, against Cobb County and Sheriff Warren.  In the lawsuit, Mr.

Daker challenged some of the policies at the CCADC, where he was held from

January of 2010 until October of 2012 pending his state trial for murder.  As

---

[*]Honorable Mark E. Walker, United States District Judge for the Northern District of
Florida, sitting by designation.

2

relevant here, Mr. Daker alleged that the CCADC's law library was inadequate and that restrictions placed on him as to legal research violated his right of access to the courts; that the CCADC's mail/package screening and rejection policy violated his due process rights; that the CCADC's total ban on hardcover books violated RLUIPA and his freedom of speech rights under the First Amendment; and that the CCADC's policy of holding all religious services on Wednesday, the only day of the week that there was no regular visitation, violated RLUIPA and his free exercise rights as a Muslim under the First Amendment.

The district court granted summary judgment in favor of Sheriff Warren on all claims except for the RLUIPA claim relating to the Wednesday-only services, which it dismissed as moot. Mr. Daker now appeals. With the benefit of oral argument, and after a review of the record, we affirm the district court's resolution of the § 1983 access to courts claim and the RLUIPA hardcover book ban claim, but reverse the grant of summary judgment with respect to the § 1983 due process and First Amendment claims, as well as the dismissal of the RLUIPA Wednesday-only services claim, and remand for further proceedings.[1]

**I**

---

[1] On appeal, Mr. Daker does not challenge the district court's ruling that, except for the RLUIPA claim concerning the hardcover book ban, he is only able to sue Sherriff Warren in his individual capacity for nominal damages. We therefore proceed with that ruling as a given.

We review a district court's grant of summary judgment *de novo*, viewing the facts in favor of the non-moving party. *See Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1203 (11th Cir. 2010). Summary judgment is appropriate only if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). But "an inference based on speculation and conjecture is not reasonable." *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).

## II

It is "beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). As a pre-trial detainee charged with murder, Mr. Daker was placed in a "max 2" security classification at CCADC and was not allowed physical access to the institution's law library. He alleged that the inadequacy of the law library, and the restrictions placed on him with respect to legal research, denied him access to the courts.

## A

The magistrate judge recommended granting summary judgment against Mr. Daker on his § 1983 access to courts claim because he had not presented evidence

4

demonstrating injury resulting from the alleged inadequacy of the law library at CCADC and the alleged denial of legal materials.  The magistrate judge noted that Mr. Daker had filed a "massive" amount of pleadings and motions in which he cited "scores, if not hundreds, of cases in support of his claims," and that he did not have a constitutional right of access to a law library as a pre-trial detainee at CCADC because he had waived his right to counsel in his criminal case.  *See* D.E. 109 at 40–41 & n.9 (citing *Smith v. Hutchins*, 426 F. App'x 785, 789 (11th Cir. 2011)).

Mr. Daker objected to the magistrate judge's report and recommendation, arguing that he was denied counsel in his criminal case between March and December of 2011 even though he wanted counsel to represent him during that period of time, and that even if he had freely chosen to represent himself in that span, he still had a constitutional right to meaningful access to legal materials at the CCADC.  He also asserted that he suffered injury because he was unable to file timely motions on a host of matters in various cases due to his lack of access to the appropriate rules for filing such motions.

The district court overruled the objections.  *See* D.E. 145 at 10–13. According to the district court, there was no indication that Mr. Daker had presented these additional issues to the magistrate judge.  In addition, under Eleventh Circuit precedent, such as *Edwards v. United States*, 795 F.2d 958, 961

n.3 (11th Cir. 1986), "[w]hen counsel is offered, the alternative of a library is not mandatory." It was undisputed that Mr. Daker was able to submit requests to the law librarian, who either pulled the physical documents from the library or conducted electronic Westlaw research to obtain the documents. Mr. Daker then had one hour per week to review those documents. Finally, from December of 2010 to July of 2012, Mr. Daker—who was entitled to 200 copies of documents (excluding copies of what had to be filed in court) each month—had requested and received copies of more than 241 cases and other related documents.

**B**

On appeal, Mr. Daker argues that the district court erred in several ways. We discuss his main arguments below, and affirm as to the rest without further discussion.

Mr. Daker contends that he was denied meaningful access to the courts and that Sheriff Warren did not present any evidence of valid penological interests to support the inadequacy of the law library at CCADC and/or the restrictions placed on him. For purposes of this appeal, we assume, without deciding, that Mr. Daker demonstrated the inadequacy of the law library and research materials and the unreasonableness of the restrictions placed on him. But that is not enough for Mr. Daker to avoid summary judgment on his access to courts claim. He must also show that he suffered injury, *i.e.*, that the deficiencies "hindered his efforts to

6

pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). *See also Alvarez v. Att'y Gen.*, 679 F.3d 1257, 1265 (11th Cir. 2012) (explaining that, to show a violation of the right of access to the courts, a prisoner must show actual injury). Our review of this complicated record leads us to conclude that the district court correctly ruled that Mr. Daker did not show injury under *Lewis* and its progeny.

First, to the extent that Mr. Daker says he was not able to locate the former Fifth Circuit's decision in *Cruz v. Hauck*, 475 F.2d 475 (5th Cir. 1973), which was helpful to his claim concerning the ban on hardcover books, we disagree. Mr. Daker admits that he was able to locate the subsequent 1980 decision in that case, *Cruz v. Hauck*, 627 F.2d 710 (5th Cir. 1980). That later *Cruz* decision cited to the earlier *Cruz* decision and explained that it involved an access to courts claim and that it resulted in a remand to the district court for an evidentiary hearing. *See id.* at 712 n.2. Thus the 1973 *Cruz* decision was available to Mr. Daker.

Second, although Mr. Daker claims that he suffered harm—*e.g.*, the missing of deadlines for certain pretrial motions, ignorance of requirements for other motions, and the inability to brief the merits of his pretrial double jeopardy claim—during the period of time that he wanted counsel in his criminal case (from March to December of 2011), he has not explained how the outcomes of disputed matters would have been different with a better law library or lesser restrictions. Stated differently, he has not explained how he had colorable claims for relief that

7

he could have asserted but for the alleged lack of access to the courts. *See Alvarez*, 679 F.3d at 1266 ("Alvarez can hardly claim that he was denied the opportunity to present [certain constitutional claims] to a court when he has no such colorable claims in the first place."); *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) ("a litigant asserting an access claim must also prove that he has a colorable underlying claim for which he seeks relief").

Third, we are not persuaded by Mr. Daker's contention of prejudice in his habeas cases. Mr. Daker contends that he was not able to conduct research on the exhaustion requirements of 28 U.S.C. §§ 2241 and 2254 with respect to seeking federal collateral relief before pursuing direct relief in the state system. Again, however, Mr. Daker has not shown that his habeas corpus petitions would not have been dismissed (or would have been successful) had he been able to perform more legal research. *See Alvarez*, 679 F.3d at 1266; *Barbour*, 471 F.3d at 1226.

## III

Mr. Daker alleged that the CCADC's mail/package screening and rejection policy—which operated to allow prison officials to return or discard incoming mail to him in 2010, 2011, and 2012 without giving him any kind of meaningful opportunity to protest or object—violated his due process rights. The district court granted summary judgment to Sheriff Warren on this claim. First, to the extent Mr. Daker was complaining about the loss of receipts, packing slips, and related

8

enclosures, that particular claim was not exhausted, and in any event there was no evidence that Sheriff Warren had any responsibility for the negligent acts of his employees in discarding such materials. Second, as to three of the incidents that Mr. Daker complained of—in June of 2010 (when a softcover book that arrived in the same package as a hardcover book was returned), April of 2012 (when a letter containing "stickers" was returned), and June of 2012 (when a catalogue including a listing for martial arts books was returned)—the district court acknowledged that these were "[m]ore problematic," because according to Mr. Daker, those mailings were returned before he had an opportunity to object or file a grievance. But the district court concluded that Mr. Daker had not presented any evidence to cast doubt upon Lt. Col. Janet Prince's affidavit, which the district court thought showed adherence by CCADC to existing constitutional requirements. *See* D.E. 109 at 48–53 (magistrate judge's report and recommendation); D.E. 145 at 20–26 (district court's order).

According to Mr. Daker, the district court erred in all respects. We would normally review each of the district court's rationales, but Mr. Daker does not persuasively explain how he exhausted the claim concerning the loss of receipts, packing slips, and other enclosures. So we deem that claim abandoned insofar as it might give rise to distinct due process claims, *see Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–83 (11th Cir. 2014), though we consider the evidence

9

concerning this claim in assessing CCADC's implementation of its policy as to Mr. Daker's remaining claims.[2]

## A

Correctional facilities generally have the authority to regulate, screen, review, and sometimes even reject the inbound and outbound letters and mail of the inmates in their custody. *See Perry v. Sec'y, Fla. Dept. of Corr.*, 664 F.3d 1359, 1364–67 (11th Cir. 2011). That power, however, is not absolute, and is subject to certain procedural safeguards. *See id*. at 1368. So, when a correctional facility is going to reject a letter, mail, or package it must (1) provide written notice to the inmate of mail addressed to him; (2) provide the author of the mailing with a "reasonable opportunity to protest th[e] decision;" and (3) have an official other than the one who made the initial rejection of the correspondence review the complaint. *See id.* at 1368 n.2 (citing *Procunier v. Martinez*, 416 U.S. 396, 418-19 (1974)).

CCADC regulates an inmate's incoming and outgoing mail with what it refers to as its total mail/package screening and rejection policy, which we summarize. The Inmate Handbook lists various items that constitute contraband. *See* D.E. 47-3, Exh. 1 at 9–10 (CCADC Inmate Handbook). If any correspondence

---

[2] Given our ruling, we need not and do not address the district court's alternative ruling that, as to the alleged loss of receipts, packing slips, and other enclosures, there was no evidence that Sheriff Warren had any direct involvement. *See* D.E. 145 at 23.

10

shipped into the facility contains any kind of contraband, that package is returned to the sender with a letter explaining the rejection. Packages containing both contraband and approved materials are returned to the sender except for glasses, checks, and money orders. *See* D.E. 47-3 at ¶¶ 11–12 (affidavit of Lt. Col. Janet Prince). The returned package "contains a letter explaining the reason for the rejection," and when a package is returned to the sender, "the practice is to notify the inmate of this action." The affected inmate may file a grievance challenging the rejection and a "staff member" will provide a written response, but there is nothing in the Inmate Handbook or Lt. Col. Prince's affidavit indicating that such a grievance is initially heard by an official other than the one who rejected the mail in the first place (though the grievance is later forwarded to the deputy division commander for review). The inmate can appeal an adverse decision (apparently the adverse decision of the deputy division commander) but it is not clear from the affidavit or the Inmate Handbook who decides the appeal. *See id.* at ¶¶ 13–15 & Exh. 1 at 27–28.

## B

For a number of reasons, we conclude that the district court erred in granting summary judgment to Sheriff Warren on the due process claim relating to the June 2010, April 2012, and June 2012 returns of mail. Simply stated, there are issues of

11

material fact as to whether Mr. Daker and those who sent the mailings received the reasonable notice they were entitled to under *Perry*.

First, the evidence Mr. Daker submitted indicated that CCADC sent back the materials before he received notice of the rejections and had a chance to object by way of a grievance. *See, e.g.,* D.E. 85 at ¶ 11. As far as we can tell, nothing in Lt. Col. Prince's affidavit is to the contrary, and even if it was, it would only create an issue of fact. And because it takes about 6-8 weeks for the rejected material to be returned to the sender, *see* D.E. 47-3, Exh. 3, there is a question of fact about whether the post-return notice to the senders provided them with a "reasonable opportunity," *Perry*, 664 F.3d at 1368 n.2, to contest the rejections. *See, e.g.*, *Martin v. Kelly*, 803 F.2d 236, 244 (6th Cir. 1986) (holding that a "post-rejection grievance procedure would not adequately address the threat of arbitrary suppression of speech and would place a burden on the inmate, or free citizen, which is not theirs to carry").

Second, Lt. Col. Prince's affidavit does not state (much less conclusively establish) that CCADC's policy complied with the due process requirements set forth in *Perry*. The affidavit (like the Inmate Handbook) says that a grievance will be handled in the first instance by a CCADC official, but it does not indicate that this official will be someone different than the one who rejected the mailing. Moreover, as Mr. Daker explains in his brief, it is difficult (if not impossible) for

12

any independent reviewer to properly analyze a grievance relating to rejected mail if the matter in question has already been destroyed or returned to the sender, as happened here.

Third, Lt. Col. Prince's affidavit—which is completely general in nature— says nothing about how CCADC's policy was applied to Mr. Daker and the mail that was addressed to him but rejected and returned to the sender. So, even if the policy was facially constitutional under *Perry*—something the current record does not definitively show—there is still an issue of fact as to whether it was applied unconstitutionally to Mr. Daker. *See* D.E. 96-2, Exhs. E & F (conclusory denials of some of Mr. Daker's grievances and appeals relating to returned mail).

## IV

CCADC's Inmate Handbook contains a complete ban on hardcover books, *see* D.E. 47-3, Exh. 1 at 9, and Mr. Daker asserted that this ban, as applied to books mailed directly from the publisher or established booksellers like Amazon or Barnes & Noble, violated both the First Amendment and RLUIPA. *See* D.E. 1 at 5 ¶¶ 1–2 & 9 ¶ 18 (Daker Complaint). As we understand the record, there was evidence that at least some of the books Mr. Daker wished to receive were available in hardcover format only. *See* D.E. 83-1. Exh. A at 1–34; D.E. 83-2 at 1– 9; D.E. 83-2 Exh. B at 10–34; D.E. 83-3 at 1.

Lt. Col. Prince's affidavit contains only two sentences concerning the reasons and justifications for the ban, and those two sentences constitute the entire universe of evidence presented by Sheriff Warren in support of the ban:

1. Hardcover books are not permitted at the CCADC because of security concerns.

2. Hardcover books can be used as weapons or as a means of transporting contraband items.

D.E. 47-3 at ¶¶ 5-6 (Lt. Col. Prince's affidavit).

The district court granted summary judgment in favor of Sheriff Warren on Mr. Daker's challenges to the ban under the First Amendment and RLUIPA. It recognized that several circuits had struck down prison hardcover book bans, but it agreed with an unpublished Third Circuit decision, *Pressley v. Beard*, 266 F. App'x 216, 218–19 (3d Cir. 2008), that the ban here was constitutional because it was, under *Turner v. Safley*, 482 U.S. 78, 87 (1987), reasonably related to legitimate penological objectives. The district court also concluded that there were no issues of material fact. *See* D.E. 145 at 13-17.

On appeal, Mr. Daker raises a number of arguments as to why the district court erred. We address his arguments as to the First Amendment and RLUIPA claims separately.

14

## A

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," *Turner*, 482 U.S. at 89, and courts consider a number of factors in assessing reasonableness. First, there "must be a 'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it." *Id.* Thus, a "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90. Second, a court asks "whether there are alternative means of exercising the right open to inmates." *Id.* at 90. Third, a court must look at the "impact accommodation [ ] the asserted constitutional right will have on guards and other inmates, and the allocation of prison resources generally." *Id.* Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.*

With respect to the first *Turner* factor—the only one the district court appeared to analyze—the two sentences in Lt. Col. Prince's affidavit were the only evidence presented by Sheriff Warren as to the reasons for the hardcover book ban. Those two sentences—which asserted in a blanket and conclusory manner that hardcover books could be used as weapons and to smuggle contraband items—did

15

not entitle Sheriff Warren, on this record, to summary judgment on the First Amendment claim.

First, with respect to the concern about contraband, there is nothing in the record addressing why that concern exists when hardcover books are sent directly from the publisher or an established bookseller. Indeed, CCADC's Inmate Handbook already accepts books in softcover from those sources, and there is nothing in the record which indicates that softcover books cannot also be used to secrete contraband. *See* D.E. 47-3, Exh. 1 at 9 (CCADC Inmate Handbook). *Cf. Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978) (upholding prison rule limiting books received by inmates to those sent by publishers or suppliers), *overruled in part on other grounds by Thornburg v. Abbott*, 490 U.S. 401 (1989). Moreover, there is no evidence in the record as to why prison officials could not search hardcover books from publishers or booksellers for contraband the same way that they inspect softcover books, or why such inspections would be unreasonable.

Second, as to the fear that hardcover books could be used as weapons, there was no evidence that such books had in fact been used as weapons. And Mr. Daker introduced evidence that inmates at CCADC already have access to a multitude of things that can be used as weapons (e.g., razors, brooms, mops, hard plastic trays, bars of soap, shoes, hard plastic scrub brushes) but are not banned.

16

*See* D.E. 85 at ¶¶ 12–14. The question is whether there is a reasonable basis for believing that allowing hardcover books increases the likelihood of violence at CCADC, and on that issue there is no evidence to warrant granting summary judgment in favor of Sheriff Warren.  We acknowledge that Sheriff Warren has made a number of factual assertions in his brief in an effort to establish a logical connection under *Turner*, *see, e.g.,* Br. for Appellee at 18, but the statements of counsel in an appellate brief are not substitutes for evidence that should have been presented to the district court. *See Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 384 (11th Cir. 1991) ("we will not consider any non-record evidence or arguments based upon non-record evidence").

Third, Sheriff Warren's reliance on *Bell v. Wolfish*, 441 U.S. 520, 548–552 (1979), is misplaced.  In that case the prison ban on hardcover books had an exception for books sent directly from publishers. *See id.* at 550.  There is no such exception here.  Moreover, the relevant case law does not support the district court's summary judgment ruling on this record.

In our 1973 *Cruz* case, which in relevant part involved an access to courts challenge by prisoners to a hardcover book ban, we indicated—albeit in dicta— that it was not enough for prison officials to claim fear of weapons and contraband:

> Many common household items may be conceivably improvised for use as a weapon, e.g., a fork. But the possibility that a fork could be used as a weapon would not justify prison officials in forcing prisoners to eat with their fingers. . . . The . .

> . contention . . . that items of contraband could be secreted within the covers of the books is seemingly answered [by having] the inmate's possession of reading materials . . . be preceded by a careful examination to detect contraband[.]

*Cruz*, 475 F.2d at 477 (citation, internal quotation marks, and footnote omitted). We think that the discussion in *Cruz* is instructive, and supports our ruling reversing the summary judgment in favor of Sheriff Warren.

In addition to *Cruz*, we find persuasive the Seventh Circuit's decision in *Jackson v. Elrod*, 881 F.2d 441, 444–46 (7th Cir. 1989), which denied qualified immunity to prison officials who had been sued by a pretrial detainee after they implemented a total ban on hardcover books, including those sent directly from the publisher, and there did not exist alternative means of accessing the books in question. In that case the Seventh Circuit explained that, despite the same security concerns asserted here, the prison officials could limit hardcover books to those sent directly from the publisher and or tear the covers off the hardcover books. *See id.* at 446.

Finally, the Third Circuit's unpublished decision in *Pressley*, upon which the district court relied, is distinguishable on its facts. That case involved not a wholesale ban on hardcover books, but rather the removal of a hardcover Qur'an from a Muslim inmate who was in the institution's special management unit. *See* 266 F. App'x at 218–19. In addition, the prison officials submitted more detailed

18

affidavits concerning the danger posed by the hardcover Qur'an and the ability of the inmate to practice his religion without it. *See id.*

In sum, there are material issues of fact as to whether there is a logical connection between the total ban on hardcover books and the security interests asserted by CCADC. "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006).

Our ruling is a narrow one. We do not hold that CCADC's policy of banning all hardcover books is unconstitutional as applied to Mr. Daker. We conclude only that, on this record, Sheriff Warren was not entitled to summary judgment on Mr. Daker's First Amendment challenge to this policy as applied to books sent directly from publishers or booksellers.[3]

## B

The RLUIPA standard for a prison regulation is different than the First Amendment standard. *See* 42 U.S.C. § 2000cc-1. Under RLUIPA, a prisoner has the initial burden to show that his religious exercise is grounded in a sincerely held religious belief and that the regulation substantially burdens his religious exercise.

---

[3] On remand, the district court may wish to reopen the summary judgment record to allow the parties to submit more evidence on the first *Turner* factor. If it does, and if it finds that Sheriff Warren shows a logical connection between the ban and the security interests asserted, it should address the remaining *Turner* factors. *See Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) ("If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor.") (citation omitted).

19

*See Holt v. Hobbs*, 135 S.Ct. 853, 862–63 (2015). If he does so, the burden shifts to prison authorities, who then must show that burdening the religious exercise of the particular prisoner is the least restrictive means of furthering a compelling governmental interest. *See id*.

On this claim, we affirm the district court's grant of summary judgment. Although Mr. Daker listed some religious books that he could only obtain in hardcover format, *see e.g.*, D.E. 85 at ¶¶ 2–5, he did not explain or show how the inability to acquire these books constituted a substantial burden on his religious exercise. Without such a showing, the burden never shifted to Sheriff Warren to show that the ban was the least restrictive means of furthering a compelling governmental interest. *Cf. Holt*, 135 S.Ct. at 862 (finding that inmate, who was forced to choose between religious belief (the growth of a ½ inch beard) and disciplinary action demonstrated a substantial burden on his religious exercise).

## V

Mr. Daker, who, as noted, is Muslim, wanted to attend Jumu'ah services at CCADC on Friday afternoons, when those services must be held according to the Qur'an. *See* D.E. 86 at ¶¶ 4–8. The Georgia Department of Corrections recognizes in its operating procedures that Friday Jumu'ah services are "essential" and "cannot be made up at an earlier or later time." D.E. 86-1 at 2–4. *See also O'Lone v. Estate of Shabazz*, 482 US. 342, 345 (1987) ("Jumu'ah is commanded

by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.").

Mr. Daker, however, was not permitted to attend Friday Jumu'ah services while he was at CCADC because the institution's policy was that all religious services had to take place on Wednesday, the only day when visitation "does not occur." *See* D.E. 47-3 at ¶¶ 8–9 (affidavit of Lt. Col. Prince). According to Sheriff Warren, on the other days of the week CCADC does not have enough manpower for deputies to accompany inmates to their various religious services. *See id.* Mr. Daker claimed that the Wednesday-only policy for religious services violated RLUIPA and his free exercise rights under the First Amendment.

## A

The district court dismissed the RLUIPA claim related to the Wednesday-only policy for religious services on mootness grounds. The district court explained that the only available remedy for Mr. Daker under RLUIPA was prospective injunctive relief. Because Mr. Daker had been transferred to a state prison following his murder conviction, the district court held that any assertion of possible future injury to him at CCADC was too tenuous and speculative. *See* D.E. 145 at 18-19.

We review the district court's mootness ruling *de novo*. *See Nat'l Adv. Co. v. City of Miami*, 402 F.3d 1329, 1331 (11th Cir. 2005). It is true, as a general

matter, that "a transfer or release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."  *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011).  So, had Mr. Daker been transferred from CCADC to a state prison to serve his sentence for murder, and remained in that state prison (or any other state prison), his RLUIPA claims for declaratory and injunctive relief relating to CCADC would have been moot.  *See, e.g., Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) ("The most that can be said is that if Cotterall is again incarcerated in a minimum security facility, and again charged with a disciplinary infraction, he might again be transferred to Coffee County jail.  This is too speculative.").

But the record here shows that Mr. Daker—because of his criminal case in Cobb County—has been returned to CCADC two times (in August of 2013 and October of 2013) since his transfer to state prison in October of 2012.  Those stays at CCADC were, respectively, 10 days and 5 days.  *See* D.E. 143, 144, 153, 154.[4]

The length of these return stays at CCADC are long enough for Mr. Daker to be denied Friday Jumu'ah services, yet too short to allow his RLUIPA claim to be litigated to its conclusion, thereby possibly making this situation "capable of

---

[4] It also appears that Mr. Daker may have been returned to CCADC in September/October of 2014 in relation to one of his civil cases (No. 1:14-CV-03180).

22

repetition yet evading review." *See generally Turner v. Rogers*, 564 U.S. 431, 439–41 (2011). As far as we can tell, the district court did not address the impact of Mr. Daker's returns to CCADC on the matter of mootness (understandably with respect to the October 2013 return, which occurred after it had ruled). Under the circumstances, we believe that it is best to vacate the district court's dismissal of the RLUIPA religious services claim and remand for further proceedings on the issue of mootness. *See Allen*, 502 F.3d at 1267 (although district court had correctly dismissed a RLUIPA religious exercise claim for injunctive relief as moot due to the plaintiff's release from prison, the plaintiff's re-incarceration in the same prison system, after district court's dismissal, meant that RLUIPA claim was not moot); *Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975) (prisoner's First Amendment claim was not moot where prison officials could not say that prisoner, who had since been transferred to another facility, would not be returned to the original facility where prisoner's claim arose).

We express no view on the mootness question. But we think the district court should take evidence from the parties (in the way it deems appropriate) on facts pertinent to mootness, including the number of times Mr. Daker has been returned to CCADC since his transfer in October of 2012, the reasons for those returns, and whether he is expected to return to CCADC in the future due to his criminal case or his civil cases.

23

**B**

Finally, we turn to the First Amendment free exercise claim. On this claim, we agree with the district court, *see* D.E. 145 at 19–20, that the Wednesday-only policy for religious services was constitutional.

Again, "[w]hen a prison regulation impinges on inmates' constitutional rights the regulation is valid if it is reasonably related to legitimate penological interest." *Turner*, 482 U.S. at 89. Because Wednesday was the only day when general visitation was not allowed at CCADC, officials were able to use available staff that day to accompany the many inmates and detainees to the religious services of their choice. *See* D.E. 47-3 at ¶¶8–9 (affidavit of Lt. Col. Prince). Although some visitors may have been permitted inside CCADC on Wednesday, that does not detract from the validity of the Wednesday-only policy for religious services. *See O'Lone*, 482 U.S. at 346–47, 351–52 (rejecting First Amendment challenge of Muslim inmates who were prevented from attending Friday Jumu'ah services due to prison policy which did not allow inmates on outside work details to go back inside the prison except for emergencies).[5]

**VI**

---

[5] Mr. Daker does not address the other *Turner* factors in this brief, so we do not discuss them.

24

We affirm the district court's rulings with respect to the claim alleging denial of access to courts, the RLUIPA claim concerning the hardcover book ban, and the First Amendment claim relating to the Wednesday-only religious services. We reverse and remand as to the due process claim challenging CCADC's total mail/package screening and rejection policy, the First Amendment claim concerning the hardcover book ban, and the RLUIPA claim concerning the Wednesday-only services.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**