[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14220

_____

D.C. Docket No. 4:12-cv-00239-MW-CAS

PRISON LEGAL NEWS,
A project of the Human Rights Defense Center,
a Not-for-Profit Washington Charitable Corporation,

Plaintiff-Appellee
Cross Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Defendant-Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(May 17, 2018)

Before ED CARNES, Chief Judge, DUBINA, Circuit Judge, and CONWAY,[*] District Judge.

ED CARNES, Chief Judge:

From time to time we have all followed the advice of Oscar Wilde and gotten rid of temptation by yielding to it.[1]  Yielding to the temptation to commit an act that the law forbids can lead to bad consequences, including imprisonment. Prison officials have the duty to reduce the temptation for prisoners to commit more crimes and to curtail their access to the means of committing them.  The Constitution does place some limits on the measures that corrections officials may use to carry out that duty, which is what this case is about.

The Florida Department of Corrections has rules aimed at preventing fraud schemes and other criminal activity originating from behind bars, but inmates continually attempt to circumvent measures in place to enforce those rules.  The Department, for its part, continually strives to limit sources of temptation and the means that inmates can use to commit crimes.  One way it does that is by preventing inmates from receiving publications with prominent or prevalent advertisements for prohibited services, such as three-way calling and pen pal solicitation, that threaten other inmates and the public.  In the Department's

---

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

[1] Oscar Wilde, The Picture of Dorian Gray 19 (Joseph Bristow ed., Oxford Univ. Press 2006) (1890).

experience, those ads not only tempt inmates to violate the rules and commit crimes, but also enable them to do so.

One publication the Department impounds based on its ad content is plaintiff Prison Legal News (PLN)'s monthly magazine, Prison Legal News.  PLN contends that the Department's impoundments of its magazine violate the First and Fourteenth Amendments.  After a bench trial, the district court ruled that the impoundments do not violate the First Amendment but the failure to give proper notice of them does violate the Fourteenth Amendment.  We agree.

## I.      FACTS AND PROCEDURAL HISTORY

### A.     Facts

#### 1.      The Florida Department of Corrections

Florida law requires the Department of Corrections to "protect the public through the incarceration and supervision of offenders," to protect offenders "from victimization within the institution," and to rehabilitate offenders.  Fla. Stat. § 20.315(1), (1)(d).  The Department strives to balance those mandates of public safety, prison security, and rehabilitation.  That is no small task.  It employs 16,700 officers to oversee 100,000 inmates in 123 facilities throughout Florida.  Those officers enforce a multitude of rules to ensure prison security and public safety.  See, e.g., Fla. Admin. Code rr. 33-602.101, .201, .203 (rules governing inmate care, property, and control of contraband).

3

To promote its rehabilitation mandate, the Department grants inmates phone, pen pal, and correspondence privileges so that they can stay in touch with family and friends. Id. r. 33-210.101(9) (allowing inmates to correspond with pen pals); id. r. 33-602.201 app. 1 (authorizing inmates to keep up to 40 stamps for correspondence); id. r. 33-602.205(1) (granting telephone privileges). Those and similar privileges pose problems in Florida prisons and elsewhere. Inmates have the time, talent, and tendency to use their phone, pen pal, and correspondence privileges to conduct criminal activity, thwarting efforts to protect inmates and the public. The record is heavy with evidence of that unfortunate reality.

James Upchurch, the Department's Assistant Secretary for Institutions and Re-entry, testified that "[g]iven uncontrolled and unverifiable telephone access, inmates have been found to use such opportunities to harass the general public, [D]epartment employees, their victims[,] and to search for new victims." He cited the example of incarcerated Mexican mafia members in California who used a network of prison phones to sell drugs and conduct other illegal activity. Prison Legal News itself has reported on instances of inmates abusing their phone privileges. See News in Brief: Florida, Prison Legal News, Nov. 2011, at 50 (reporting how an inmate discovered that the county jail's phone system provided double refunds each time a call did not go through, prompting the inmate to make calls and then hang up until he had made the $1,250 he needed for bail); Mark

4

Wilson, <u>Reach Out and Defraud Someone:  Oregon Jail Prisoners Commit Phone Scams</u>, Prison Legal News, Nov. 2010, at 24–25 (reporting on inmates' use of prison phones to conduct identity theft scams, one of which resulted in the indictment of an inmate on 35 counts of identity theft); <u>News in Brief:  Florida</u>, Prison Legal News, Sept. 2010, at 50 (reporting how a county inmate used the prison phones to call in bomb threats).[2]

Like phone privileges, pen pal privileges may open doors to criminal activity.  Inmates abuse pen pal privileges by soliciting kind-hearted but gullible people and then defrauding them.  Pen pal scams are so common that the United States Postal Service warns customers that pen pal ads have "proliferated in recent years" and that "many ads placed by prisoners are part of a sophisticated mail fraud scheme that misuses postal money orders to bilk consumers out of their hard earned savings."[3]

---

[2] PLN submitted into evidence every issue of <u>Prison Legal News</u> from 2002 through 2014.

[3] <u>Prison Pen Pal Money Order Scam</u>, U.S. Postal Inspection Service, http://www.postalinspectors.uspis.gov/investigations/mailfraud/fraudschemes/othertypes/penpalfraud.aspx [https://web.archive.org/web/20170204190103/postalinspectors.uspis.gov/investigations/mailfraud/fraudschemes/othertypes/penpalfraud.aspx]; <u>see also</u> <u>Woods v. Comm'r of the Ind. Dep't of Corr.</u>, 652 F.3d 745, 747 (7th Cir. 2011) (recounting that 350 inmates had placed ads soliciting pen pals on websites, that "the majority of these inmates had . . . misrepresented themselves to the public in their postings on the sites," and that several pen pals felt deceived after "sending money to prisoners who had lied about their release dates and offenses of conviction"); <u>United States v. Brown</u>, 7 F.3d 1155, 1158 (5th Cir. 1993) (stating that a Mississippi inmate scammed thousands of dollars out of a 65-year-old Florida retiree he met through a "lonely hearts pen-pal club").  [In keeping with Eleventh Circuit Internal Operating Procedure 10, "Citation to Internet Materials in an Opinion," under Federal Rule of

Inmates also abuse correspondence privileges.  For instance, one Florida inmate sent threatening letters to a federal magistrate judge, one of which informed the judge that someone would "stick a curling iron up [the judge's] twat and plug that sucker in," while another stated that the inmate was coming to kill her.  See United States v. Adamson, No. 4:00cr52, 2007 WL 2121923, at *1 (N.D. Fla. July 23, 2007) (unpublished).  Another way inmates abuse correspondence privileges is by using their stamps as a currency in the underground prison economy to buy drugs, sexual favors, and anything else they can bargain for.  See United States v. Becker, 196 F. App'x 762, 763 & n.1 (11th Cir. 2006) (unpublished) (noting how one inmate ran a prison gambling operation where inmates paid him with stamps and another inmate used stamps to pay for heroin); United States v. Martin, 178 F. App'x 910, 911 (11th Cir. 2006) (unpublished) (stating how an inmate used letters with hidden compartments to smuggle heroin into the prison, which he then gave to another inmate in exchange for stamps).  The problems associated with stamps increase when inmates can send their stamps to "cash-for-stamps" companies that will exchange the stamps for cash at a percentage of the stamps' face value. Inmates can use the cash to purchase goods and services outside prison walls, which facilitates contraband smuggling and the corruption of prison guards.

_____

Appellate Procedure 36, a copy of the internet materials cited in this opinion is available at this Court's Clerk's Office.]

6

Recognizing that when inmates abuse their privileges it threatens other inmates and the public, the Department has sought to prevent that abuse. First, it has prohibited three-way calling, which includes any type of call transferring. Fla. Admin. Code r. 33-602.205(2)(a). Three-way calling allows inmates to circumvent the regulations the Department has in place to stop them from using prison phones to harass the public, arrange contraband smuggling, and conduct other criminal activity. The Department's regulations restrict inmates to calling no more than ten people on a pre-approved list and require each outgoing call to begin with an automated message informing the recipient that the call is coming from a Department prison. Id. r. 33-602.205(2)(a), (g). The Department also monitors and records some inmate calls. Id. r. 33-602.205(1).

Second, the Department does not allow inmates to "solicit or otherwise commercially advertise for money, goods, or services," which includes "advertising for pen-pals" and "plac[ing] ads soliciting pen-pals" on social media and inmate pen pal websites. Id. r. 33-210.101(9). Third, inmates cannot use "postage stamps as currency to pay for products or services." Id. r. 33-210.101(22). Fourth, inmates cannot conduct a business while confined, which includes "any activity in which the inmate engages with the objective of generating revenue or profit while incarcerated." Id. r. 33-602.207(1)–(2). That rule exists

7

because inmate businesses increase the risk of fraud and burden Department staff with monitoring more mail and phone activity. Id. r. 33-602.207(2).

Just as some inmates abuse their privileges, some also evade or break the rules restricting their privileges. For example, the Department's telephone security vendor can detect three-way call attempts by the clicking noise that occurs when a call is transferred, but inmates will blow into the receiver when transferring a call to mask that clicking noise. There are nearly 700,000 three-way call attempts each year in Department prisons, leading officials to believe that inmates would not make so many attempts if some were not succeeding. Disciplinary reports confirm that some attempts do succeed. Despite the rule prohibiting pen pal solicitation, some inmates manage to post profiles on pen pal solicitation websites. Inmates also succeed in exchanging stamps for cash — one cash-for-stamps company deposited over $50,000 into inmates' accounts over several years. And as for the prohibition against conducting a business, one inmate, a jailhouse lawyer known as "H&R Block," lived up to his nickname by running a tax filing business where he would file tax returns on behalf of other inmates. See News in Brief:  Florida, Prison Legal News, Apr. 2010, at 50. Of course, those tax returns were false, and the inmate faced up to 90 years in prison for his scheme. Id.

2.    The Department's Admissible Reading Material Rule

Because some inmates abuse their privileges and break the rules put in place to stop that abuse, the Department takes additional steps to help increase prison security and public safety. As Department official Upchurch testified, protecting the public "goes further than just . . . keeping the inmates inside the fence and not allowing them to be out committing the crimes that they commit." Prison security challenges evolve. Upchurch cited the availability of contraband cell phones, which give inmates unregulated internet access and have been used in other states to orchestrate prison riots and arrange assaults on prison staff. PLN's expert acknowledged that Department officials must be proactive in addressing security problems. As Upchurch testified, "act[ing] after the fact [in the prison business] risk[s] someone's life."

One of the ways the Department tries to stay a step ahead of inmates is to screen all incoming publications for content that might enable them to break prison rules. See Fla. Admin. Code r. 33-501.401(3). Under the Department's Admissible Reading Material Rule, inmates can "receive and possess publications . . . unless the publication is found to be detrimental to the security, order or disciplinary or rehabilitative interests of any institution of the [D]epartment . . . or when it is determined that the publication might facilitate criminal activity." Id. For example, to bolster the Department's ban on inmates possessing firearms or other dangerous weapons, id. r. 33-602.203(2), the rule

9

prohibits inmates from receiving publications that "describe[ ] procedures for the construction of or use of weapons," id. r. 33-501.401(3)(a).

The Admissible Reading Material Rule applies that same logic to ads for prohibited services. A publication is impounded if it contains ads for three-way calling services, pen pal solicitation services, cash-for-stamps exchange services, or for conducting a business, but only "where the advertisement is the focus of, rather than being incidental to, the publication[,] or the advertising is prominent or prevalent throughout the publication." Id. r. 33-501.401(3)(*l*). The Department can also impound any publication that "otherwise presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person." Id. r. 33-501.401(3)(m). Once mailroom staff impound an issue of a magazine for violation of the rules, it is withheld from inmates until the Department's Literature Review Committee makes a final decision about whether the issue does violate the Admissible Reading Material Rule. Id. rr. 33-501.401(5), (8), (14)(a).[4] Mailroom staff cannot impound all issues of an entire publication in

---

[4] The Admissible Reading Material Rule defines "impoundment" as the action taken by mailroom staff "to withhold an inmate's incoming publication . . . pending review of its admissibility by the Literature Review Committee." Fla. Admin. Code r. 33-501.401(2)(b). When the Committee upholds an impoundment, that is a "rejection" and the issue is considered contraband. Id. r. 33-501.401(2)(j). The difference between an impoundment and rejection is immaterial here, so we use the term "impound" to refer to the Department's decision to withhold a particular issue from an inmate subscriber.

10

advance; instead, they must separately review and decide whether each issue of a publication violates the Admissible Reading Material Rule. Id. r. 33-501.401(5).[5]

### 3.    Prison Legal News and the First Impoundments of It

Prison Legal News is a monthly magazine founded in 1990 that reports on legal developments in the criminal justice system and other topics that affect inmates. About 70% of the magazine's 7,000 nationwide subscribers are inmates. It has subscribers in all 50 state prison systems and the Federal Bureau of Prisons. Only about 70, or one percent of the 7,000 subscribers, are Florida inmates. Prison Legal News began carrying advertisements in 1996 to cover its publication costs. Not surprisingly, the ads are placed by companies whose target audience is prisoners. Two examples are law firms specializing in prisoner litigation and schools offering inmate correspondence courses. Nothing wrong with that.

In 2003 the Department began impounding some Prison Legal News issues based on ad content. The problem ads included ones for pen pal solicitation, cash-for-stamps exchange services, and three-way calling services. The ads for pen pal solicitation offered inmates the opportunity to post on the company's website a profile with a photo and address, and the public could search for that profile by the inmate's age, race, and other features. The cash-for-stamps ads gave inmates the

---

[5] For example, if the Department decides that the January issue of Prison Legal News violates the Admissible Reading Material Rule, then it impounds that issue. Fla. Admin. Code r. 33-501.401(8). But when the February issue arrives, mailroom staff must review that latest issue to determine whether it complies with the rule. Id. r. 33-501.401(5).

opportunity to exchange stamps for cash at a percentage of the stamps' face value. The three-way calling ads offered discount phone services on collect calls from inmates. The Department determined that those phone services fell under its broad definition of "three way calling" because the companies forwarded or transferred the inmates' collect calls to the call recipient's home phone, cell phone, or blocked home phone number.[6] The Department determined that all three types of ads violated Rule (3)(*l*), but it was especially concerned with the ads for three-way calling because it believed that its telephone security vendor could not trace inmate calls made through the discount phone services.

PLN sued the Department in 2004 to stop the impoundments. After the Department's telephone vendor gave assurances that it could block three-way call attempts, the Department agreed in 2005 not to impound Prison Legal News as long as all the problematic ads were incidental to the overall publication. Because the Department began allowing inmate subscribers to receive Prison Legal News we rejected PLN's argument that an injunction was necessary to stop the

---

[6] PLN asserts that Prison Legal News has never run ads for three-way calling, but its brief and one of its trial exhibits contradict that assertion. It acknowledges that its magazine contains ads for discount phone services that allow subscribers to avoid long distance charges by assigning the inmate a local number to call, and then transferring that call to the final call recipient (so if a Miami inmate wants to call his mother in Kansas, the Miami inmate can call a Miami number and the call is then transferred to Kansas). That type of call service falls under the Department's definition of three-way calling. See Fla. Admin. Code r. 33-602.205(2)(a) ("Inmates shall not make three-way telephone calls nor make calls to numbers on the list which are then transferred to other telephone numbers."). And PLN's trial exhibit shows that almost every issue of Prison Legal News from January 2002 to December 2014 included ads for the prohibited services. One of the columns in that exhibit is labeled "3-Way Calls."

12

impoundments, and we affirmed the district court's grant of judgment as a matter of law to the Department.  See Prison Legal News v. McDonough, 200 F. App'x 873, 876–78 (11th Cir. 2006) (unpublished).

    4.      The Department's Renewed Impoundments of Prison Legal News

 That peace was short-lived.  Several changes after 2005 undermined the truce and led to the current conflict.  For one thing, the number and size of rule-defying ads increased after 2005, resulting in their becoming less incidental and more prominent.[7]  As the ads became more prominent, Department officials noticed an increase in the number of inmates sending stamps to cash-for-stamps companies.  They also became concerned about a phone technology called Voice over Internet Protocol, which makes it harder to detect three-way call attempts by transferring calls over the internet with no noise.  That technology had not been an issue in 2005, but in the following years it became more widespread and more of a problem.

---

[7] Although the percentage of the magazine containing ads prohibited by Rule (3)(*l*) increased only from an average of 9.21% in 2005 to 9.80% in 2009, those naked percentages don't tell the whole story because the number of full-page and half-page ads increased.  The magazine also grew from 48 pages in 2005 to 64 pages in 2014, which allowed PLN to include more problematic ads without changing the proportion of the magazine devoted to such ads.

More importantly, the record does not stop at 2009.  PLN's own exhibit shows that the percentage of problematic ads increased from 9.80% in 2009 to 15.07% in 2014, the last year of the impoundments that are covered in the record.  That is an increase of more than 50% in the percentage of problematic ads in the most recent five-year period for which there is data.

New types of ads offering "prisoner concierge" and "people locator" services also began to appear in Prison Legal News after 2005. Prisoner concierge companies offer inmates a variety of administrative and financial services. One such company, Prisoner Assistant, ran ads offering inmates "access to hundreds of professional services that have never before been available to prisoners," including money orders, online fund transfers, internet purchases and research, website development, cell phone contracts, and Green Dot cards (prepaid debit cards that can be reloaded and used to send money). That company even provides inmates with an "Executive Assistant to manage [the inmate's] file and provide personal attention to [the inmate's] requests," and claimed in its ad that "[i]f it can be done, we will try to do it." According to the Department, prisoner concierge companies threaten prison security and public safety by, among other things, making it easier for inmates to create an alternate identity that conceals their inmate status from people on the outside, enabling them to violate prison rules and commit crimes.

People locator companies are just that. One such company placed ads claiming that it can find "just about anyone" including "hard to find people [and] unlisted numbers and address[es]." That company has a database of 1.2 billion records and provides inmates with a person's date of birth, email address, any unlisted telephone numbers, and social security number. With reason, the Department fears that inmates will use people locator services to perpetrate scams

14

or allow inmates to find and harm judges, jurors, witnesses, or anyone else the inmate may want to harass or harm.

All of those developments between 2005 and 2009 — the increasing number and size of the rule-defying ads, the growth of internet-based phone technology, and the appearance of prisoner concierge and people locator ads — led the Department to begin impounding Prison Legal News again in September 2009.[8] The Department decided that the ads for three-way calling services, pen pal solicitation services, and cash-for-stamps exchange services violated Rule (3)(*l*).  It also determined that the ads for prisoner concierge and people locator services violated Rule (3)(m), the provision prohibiting any publication that "presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person."  Id. r. 33-501.401(3)(m).  The Department impounds

---

[8] The Department amended Rule (3)(*l*) in June 2009.  The earlier version provided that a publication would not be impounded as long as the ads were "merely incidental to, rather than being the focus of, the publication."  The amendment provided that a magazine could also be impounded if the rule-defying ad was "prominent or prevalent throughout the publication."  PLN contended at trial that the Department amended the rule to keep Prison Legal News out of Florida prisons, but the district court rejected that contention as conjecture and found that the Department amended Rule (3)(*l*) to make it clearer and to address its new security concerns. PLN makes only a cursory attempt to raise that contention here, offering no supporting authority, which means that it is abandoned.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he . . . raises it in a perfunctory manner without supporting arguments and authority.").  Its assertion that the "prominent or prevalent" language is too vague is not properly before us because the district court denied PLN's motion to amend its complaint to include a void-for-vagueness claim, and PLN did not appeal that ruling.  See Singleton v. Wulff, 428 U.S. 106, 120, 96 S. Ct. 2868, 2877 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

15

other publications that violate those rules, but it is the only corrections department in the country that impounds Prison Legal News based on its ad content.

     5.     The Department's Failure to Provide Notice to PLN

At the time of trial in January 2015, the Department had impounded every issue of Prison Legal News since September 2009, a total of 64 issues (the magazine has 12 issues per year). The Admissible Reading Material Rule requires the Department to send to all publishers a notice form listing the "specific reasons" for an impoundment. Fla. Admin. Code r. 33-501.401(8)(b). Despite that rule, the Department did not send PLN a notice form for 26 out of the 62 monthly issues it impounded between November 2009 and December 2014, which means that PLN did not receive a notice form for 42% of the issues impounded during that time span. That number rises to 87% when defective notice forms that did not list the reasons for the impoundment are considered.

When PLN did receive a notice form for an impounded issue, it appealed the impoundment decision to the Department's Literature Review Committee, which makes the final decision whether an issue violates the Admissible Reading Material Rule. See id. rr. 33-501.401(14)(a), (15)(a). Those appeals were unsuccessful, so PLN sued the Department in November 2011 to stop the impoundments.

### B.    Procedural History

16

PLN brought two claims under 42 U.S.C. § 1983 against the Department Secretary in her official capacity. First, it claimed that Rules (3)(*l*) and (3)(m), as applied to Prison Legal News, violate the First Amendment. Second, it claimed that the Department's failure to provide PLN with proper notice for each impounded monthly issue violated its right to procedural due process under the Fourteenth Amendment. PLN sought declaratory and injunctive relief against the Department.

After a bench trial, the district court ruled against PLN on the First Amendment claim and for it on the Fourteenth Amendment claim. The court entered an injunction requiring the Department to provide PLN with notice each time it impounded a monthly issue of the magazine and the reason for the impoundment. The Department appeals the court's judgment that it violated PLN's due process rights. PLN cross-appeals the court's judgment that the impoundments of Prison Legal News do not violate the First Amendment.[9]

## II.    STANDARDS OF REVIEW

---

[9] PLN also publishes a book called the Prisoner's Guerilla Handbook and sends information packets about its publications to inmates. The Department impounded those publications, and PLN claimed in its amended complaint that impounding them also violated its First and Fourteenth Amendment rights. (PLN claimed that the impoundment of all of its publications violated its constitutional rights; its amended complaint did not contain separate claims for each publication). Although PLN's brief refers to its "publications," it mentions the handbook and information packets by name only once in its 82-page initial brief. As a result, PLN has abandoned any separate challenge to those publications. See Sapuppo, 739 F.3d at 681.

17

After a bench trial, we review <u>de novo</u> the district court's legal conclusions and we review its fact findings for clear error.  <u>Proudfoot Consulting Co. v. Gordon</u>, 576 F.3d 1223, 1230 (11th Cir. 2009).  "We review the decision to grant an injunction and the scope of the injunction for abuse of discretion."  <u>Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.</u>, 522 F.3d 1200, 1208 (11th Cir. 2008).

## III.    DISCUSSION

### A.    First Amendment Claim

PLN contends that the Department's impoundments of <u>Prison Legal News</u> violate its First Amendment right of access to its inmate subscribers.  The parties agree that the deferential standard established by the Supreme Court in <u>Turner v. Safley</u>, 482 U.S. 78, 107 S. Ct. 2254 (1987), governs PLN's First Amendment challenge to the impoundments.  PLN has received a helping hand from sixteen law professors acting as amici curiae who claim an "interest in seeing that First Amendment doctrine develops in a way that promotes rather than censors free speech."  Br. of Amici Curiae at 1.  The amici contend that we should give prison management decisions decreased deference under the <u>Turner</u> standard in light of the Supreme Court's recent First Amendment decisions, mostly in other contexts.

On the First Amendment issue we begin by explaining the <u>Turner</u> standard, which requires deference to prison officials' decisions.  We then address the

18

amici's argument for diminished deference. And then we will discuss the application of the First Amendment to the impoundments.

### 1.    The Turner Standard

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner, 482 U.S. at 84, 107 S. Ct. at 2259. Inmates retain some constitutional rights in prison, id., and publishers like PLN have a First Amendment right of access to their inmate subscribers, Thornburgh v. Abbott, 490 U.S. 401, 408, 109 S. Ct. 1874, 1879 (1989).

But that right is limited. See Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996) (noting the "more limited nature of . . . First Amendment rights" in the penal context). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner, 482 U.S. at 84–85, 107 S. Ct. at 2259. Those branches are responsible for prison administration, which means that "separation of powers concerns counsel a policy of judicial restraint" and deference to prison officials' management decisions. Id. at 85, 107 S. Ct. at 2259. And "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Id. To balance judicial deference with "the need to protect constitutional rights," the Turner Court held that a prison regulation

19

affecting constitutional rights is valid as long as "it is reasonably related to legitimate penological interests." Id. at 85, 89, 107 S. Ct. at 2259, 2261. The Department and PLN agree that the Turner standard controls here.

The Department must show "more than a formalistic logical connection between [the impoundments of Prison Legal News] and a penological objective." Beard v. Banks, 548 U.S. 521, 535, 126 S. Ct. 2572, 2581 (2006) (plurality opinion). But that does not mean that this Court sits as a super-warden to second-guess the decisions of the real wardens. See Turner, 482 U.S. at 89, 107 S. Ct. at 2262 (rejecting the view that courts should be the "primary arbiters of what constitutes the best solution to every administrative problem"). Instead, under Turner we owe "wide-ranging" and "substantial" deference to the decisions of prison administrators because of the "complexity of prison management, the fact that responsibility therefor is necessarily vested in prison officials, and the fact that courts are ill-equipped to deal with such problems." Al-Amin v. Smith, 511 F.3d 1317, 1328 (11th Cir. 2008) (quotation marks omitted); see also Pope v. Hightower, 101 F.3d 1382, 1384 n.2 (11th Cir. 1996) ("Federal courts must scrupulously respect the limits on their role by not thrusting themselves into prison administration; prison administrators must be permitted to exercise wide discretion within the bounds of constitutional requirements."). The Supreme Court has reaffirmed that point time and time again. See, e.g., Overton v. Bazzetta, 539 U.S.

20

126, 132, 123 S. Ct. 2162, 2167 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); Shaw v. Murphy, 532 U.S. 223, 229, 121 S. Ct. 1475, 1479 (2001) ("[W]e generally have deferred to the judgments of prison officials in upholding [prison] regulations against constitutional challenge."); Thornburgh, 490 U.S. at 408, 109 S. Ct. at 1879 ("[T]his Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.").

### 2.    The Amici's Diminished Deference Argument

In spite of all of those Supreme Court decisions requiring us to grant substantial deference to the decisions of prison officials, the amici argue that we should not. Claiming clairvoyance, they predict the Supreme Court will overrule its precedents, and they urge us to go ahead and effectively do that ourselves. See Br. of Amici Curiae at 2 ("Modern First Amendment jurisprudence trends toward more protections for speech rights, a direction that should inform this Court's analysis."). The amici discern a trend from several recent Supreme Court decisions, nearly all of which have nothing to do with Turner or challenges to prison regulations, to argue that increased protection of free speech requires

21

decreased deference under Turner.  See, e.g., United States v. Alvarez, 567 U.S. 709, 713–15, 729–30, 132 S. Ct. 2537, 2542–43, 2551 (2012) (holding that the Stolen Valor Act violated the First Amendment); Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 805, 131 S. Ct. 2729, 2741–42 (2011) (striking down on First Amendment grounds a statute that prohibited the sale of violent video games to minors); Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 365, 130 S. Ct. 876, 913 (2010) (holding that the government "may not suppress political speech on the basis of the speaker's corporate identity").  In any event, our duty is to follow Supreme Court decisions, not to use them to map trends and plot trajectories.

The only Court that can properly cut back on Supreme Court decisions is the Supreme Court itself.  See Hohn v. United States, 524 U.S. 236, 252–53, 118 S. Ct. 1969, 1978 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S. Ct. 275, 284 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22 (1989)  ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls,

22

leaving to this Court the prerogative of overruling its own decisions."); Evans v.

Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1263 (11th Cir. 2012) ("The Court has

told us, over and over again, to follow any of its decisions that directly applies in a

case, even if the reasoning of that decision appears to have been rejected in later

decisions.").

Even if it were otherwise, only one of the post-Turner decisions that amici

cite even mentions Turner, and that decision actually confirms that we owe

deference to the decisions of wardens and other prison officials.  See Beard, 548

U.S. at 524–25, 535, 126 S. Ct. at 2575–76, 2581–82 (plurality opinion) (rejecting

a First Amendment challenge to a prison rule and stating that the court of appeals

erred by offering "no apparent deference to the deputy prison superintendent's

professional judgment");[10] see also Davila v. Gladden, 777 F.3d 1198, 1212–13

---

[10] Justice Thomas, joined by Justice Scalia, concurred in the judgment and agreed with the plurality that "[j]udicial scrutiny of prison regulations is an endeavor fraught with peril." Beard, 548 U.S. at 536, 126 S. Ct. at 2582 (Thomas, J., concurring).  The amici attempt to distinguish Beard, which involved a challenge to a prison policy designed to motivate better behavior by barring certain inmates from receiving publications.  Id. at 524–25, 126 S. Ct. at 2575–76 (plurality opinion).  They argue that the Beard case was exceptional because it involved maximum security inmates and that the prison's regulations were motivated by its rehabilitative goals.  Neither of those distinctions matter.  What matters is that the Beard Court did not water down Turner.  Id. at 528–33, 126 S. Ct. at 2577–80 (plurality opinion).  The amici's argument that the prison policy at issue in Beard still allowed inmates to receive legal correspondence, id. at 526, 126 S. Ct. at 2576 (plurality opinion), and that Prison Legal News is a form of legal correspondence fails on its essential premise because it is not.  We agree with the definition in the Florida Administrative Code that legal mail is "mail to and from" courts, attorneys, public defenders, legal aid organizations, agency clerks, and government attorneys.  Fla. Admin. Code r. 33.210.102(1)–(2).

23

(11th Cir. 2015) (addressing the Turner standard without any hint that it should be applied with decreased deference in light of recent Supreme Court decisions).

The Beard decision confirms that whatever the Supreme Court has done in other First Amendment cases, it has not adopted a damn-the-deference, full-speed-ahead approach to First Amendment rights within prison walls.  As a result, we categorically reject the amici's argument that we should leap-frog ahead of the Supreme Court in this area.  We follow Supreme Court decisions, here as elsewhere, instead of plotting ways around them.[11]

With the proper level of deference in mind, we will turn now to applying the Turner standard to determine whether the impoundments of Prison Legal News under its Rules (3)(*l*) and (3)(m) violate the First Amendment.

### 3.    Application of the Turner Standard

The Turner standard requires the Department to show that its impoundments of Prison Legal News are content neutral, Thornburgh, 490 U.S. at 415, 109 S. Ct. at 1882, and "reasonably related to legitimate penological interests," Turner, 482 U.S. at 89, 107 S. Ct. at 2261.  The impoundments are content neutral because they are based "solely on . . . [the magazine's] potential implications for prison security."  Thornburgh, 490 U.S. at 415–16, 109 S. Ct. at 1883.  And PLN does not

---

[11] While we categorically reject the contention and supporting arguments of the amici, we do not mean to be unfair.  The professors' brief does have good grammar, sound syntax, and correct citation form.

24

dispute that the Department's asserted interests for the impoundments — prison security and public safety — are legitimate.  See Perry v. Sec'y, Fla. Dep't of Corr., 664 F.3d 1359, 1366 (11th Cir. 2011) ("[P]rotecting the public and ensuring internal prison security are legitimate penological objectives.").  Those interests are not only legitimate, but paramount.  See Thornburgh, 490 U.S. at 415, 109 S. Ct. at 1882 ("[P]rotecting prison security . . . is central to all other corrections goals.") (quotation marks omitted).

That leaves the issue of whether the Department's impoundments of Prison Legal News are "reasonably related" to prison security and public safety.  Turner, 482 U.S. at 89, 107 S. Ct. at 2261.  The Turner Court established four factors to determine the reasonableness of prison regulations:  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether the publisher has alternative means to exercise its right of access to its inmate subscribers; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether PLN "can point to . . . alternative[s] that fully accommodate[ ] [its] rights at de minimis cost to valid penological interests."  Id. at 89–91, 107 S. Ct. at 2262 (quotation marks omitted).

25

PLN contends that the Department's impoundments of <u>Prison Legal News</u> under Rules 3(*l*) and 3(m) fail all four factors and therefore amount to unconstitutional censorship. We disagree.

a. The First <u>Turner</u> Factor: The Existence of a Rational Connection

The first <u>Turner</u> factor requires the Department to show that there is a "rational connection" between its decision to impound <u>Prison Legal News</u> and its interests in prison security and public safety. <u>Id.</u> at 89, 107 S. Ct. at 2262. The Department's position is that limiting inmates' exposure to the ads in <u>Prison Legal News</u> will reduce the risk that inmates will engage in behavior that endangers other inmates, guards, and the public. PLN's position is that there is no rational connection because there is no evidence that ads in its magazine have ever caused a security breach. PLN's argument demands too much.

The <u>Turner</u> standard does not require the Department to present evidence of an actual security breach to satisfy the first factor. Instead, the Supreme Court recognized that prison officials must be able to "<u>anticipate</u> security problems and . . . adopt innovative solutions" to those problems to manage a prison effectively. <u>Id.</u> (emphasis added). We have rejected the "misconception" that prison officials are "required to adduce specific evidence of a causal link between [a prison policy] and actual incidents of violence (or some other actual threat to security)." <u>Lawson</u>, 85 F.3d at 513 n.15. "Requiring proof of such a correlation

26

constitutes insufficient deference to the judgment of the prison authorities with respect to security needs." Id. Other circuits agree. See, e.g., Simpson v. County of Cape Girardeau, 879 F.3d 273, 280 (8th Cir. 2018) ("Cape Girardeau may seek to prevent harm that has yet to occur and, as a result, is not required to provide evidence of previous incidents of contraband reaching inmates through the mail in order to adopt a postcard-only incoming mail regulation."); Murchison v. Rogers, 779 F.3d 882, 890 (8th Cir. 2015) (stating that Turner "does not require actual proof that a legitimate interest will be furthered by the challenged policy" and that "evidence short of an actual incident satisfies" the first factor) (quotation marks omitted); Singer v. Raemisch, 593 F.3d 529, 536 (7th Cir. 2010) ("The question is not whether [a game banned by the prison] has led to gang behavior in the past; the prison officials concede that it has not. The question is whether the prison officials are rational in their belief that, if left unchecked, [the game] could lead to gang behavior among inmates and undermine prison security in the future."); Cal. First Amend. Coal. v. Woodford, 299 F.3d 868, 882 (9th Cir. 2002) (stating that prison officials "must at a minimum supply some evidence that . . . potential problems are real, not imagined," but affirming that "prison officials may pass regulations in anticipation of security problems").

In Perry, a case involving a First Amendment challenge to a Department regulation prohibiting pen pal solicitation, we did not require that prison officials

27

produce evidence of a past incident to satisfy the first Turner factor. See Perry,

664 F.3d at 1362, 1366. We held that the Department had established a rational

connection between that regulation and its security and safety interests through the

testimony of James Upchurch, id. at 1366, the same prison official the Department

relied on in the present case. He testified in Perry that "when inmates only receive

pen pals through personal associates and not pen pal companies . . . the possibility

of the inmate defrauding the pen pal is greatly reduced." Id. (emphasis added).

We did not demand any evidence that inmates' solicitation of pen pals had

previously caused a security breach. Id.

There is plenty of evidence that preventing inmates from viewing prominent

or prevalent ads for prohibited services will reduce the possibility that they will use

those services.[12] The ads not only make the prohibited services available to

---

[12] PLN asserts that the Department is judicially estopped from arguing that the problematic ads present a security threat because the Department allegedly took the position in the earlier litigation that the same types of ads do not present such a threat. See Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010) ("[J]udicial estoppel is designed to prevent a party from asserting a claim in a legal proceeding that is [clearly] inconsistent with a claim taken by the party in a previous preceding.") (quotation marks omitted). Not so. PLN's current position is not clearly inconsistent with its earlier position because the Department never represented that the ads present no security threat. Instead, its position was that the problematic ads were not a security threat as long as they remained incidental in terms of their size and number. See McDonough, 200 F. App'x at 878 (stating that we did not expect the Department to "resume the practice of impounding publications based on incidental advertisements") (emphasis added). But after 2005 the ads became more prominent (the size and number of the ads increased), ads for prisoner concierge and people locator services appeared, and phone technology changed. In view of those changes, the Department's decision to renew impoundment was not an attempt to "play[ ] fast and loose with [this Court] to suit the exigencies of self interest." In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999) (quotation marks omitted). As a result, the district court did not abuse its discretion in rejecting

inmates but also appear along with articles about inmate phone scams, the role of Green Dot cards in prison gang extortion schemes, and the nationwide problem with smuggling contraband like drugs and cell phones into prisons. An inmate reading Prison Legal News not only reads articles about inmates putting the prohibited services to dangerous use, but also sees ads that enable him to obtain those same prohibited services. As PLN's expert acknowledged, "[j]ust because there [are] rule[s] [prohibiting use of those services] is no guarantee that everybody will abide by the rule[s]." See Hudson v. Palmer, 468 U.S. 517, 526, 104 S. Ct. 3194, 3200 (1984) ("Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others."). Given that common-sense proposition, it's no surprise that Upchurch, the Department's expert, agreed with the district court's statement that the ads "create the possibility, [the] real possibility" of inmates doing an end run around prison rules. He explained how that possibility exists for each type of ad at issue in

PLN's judicial estoppel argument. And because judicial estoppel does not apply here, we need not decide the extent to which it can be applied against a state if at all. See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc., 467 U.S. 51, 60–61, 104 S. Ct. 2218, 2224 (1984) (noting the uncertainty on that point).

29

this case:  (1) three-way calling ads, (2) pen pal solicitation ads, (3) cash-for-stamps exchange ads, and (4) prisoner concierge and people locator ads.[13]

### i.    Three-Way Calling Ads

The Department is concerned with ads for three-way calling because that service undermines its ability to determine a call recipient's identity and location. For instance, the December 2009 issue of Prison Legal News featured an ad from a company that allowed inmates to make a call to a local number, which could then be forwarded to up to three different numbers.  Those types of three-way calling services, combined with the growth of internet-based phone technology, make it easier for inmates to call people outside their approved list.  Although two phone companies that advertise in Prison Legal News provide the Department's telephone vendor with the final call recipient's number and address, other companies that advertise in the magazine have not done so.  Given that Department inmates make 700,000 three-way call attempts each year — and some of those attempts succeed — the Department's effort to reduce that number by curtailing inmates' exposure to ads for that service is rational.  See Prison Legal News v. Livingston, 683 F.3d

---

[13] Rule (3)(*l*) allows the Department to impound publications that contain prominent or prevalent ads for "[c]onducting a business or profession while incarcerated."  Fla. Admin. Code r. 33-501.401(3)(*l*).  PLN asserts that the district court failed to analyze the rational connection between an ad for that kind of service and the Department's penological interests, but neither party discusses those particular ads in its briefs.  In any event, Upchurch testified that all the ads create the possibility that inmates will circumvent prison rules, which is enough to establish a rational connection.  See Perry, 664 F.3d at 1366.

201, 218 (5th Cir. 2012) (holding that it was reasonable for prison officials to conclude that removing a book "describing racial tensions in the prison context — as opposed to racial tensions more generally —" would make prison violence less likely).

PLN argues that the Department's fears about three-way calling ads are overblown. It points out that the Department allows inmates to call cell phones, even though cell phones present just as much of a security threat as three-way calling because the Department cannot identify a cell phone call recipient's location. (Identifying a call recipient's location helps the Department detect and stop criminal activity conducted over the phones). According to PLN, that alleged loophole undermines the rational connection. See Woodford, 299 F.3d at 881 (noting that a prison policy involved in that case contained "loopholes that undermine[d] its rationality"). But the Department explained why it allows inmates to call cell phones despite the security problems they present. Given the decline in landline use, prohibiting inmates from calling cell phones would curtail their ability to keep in touch with family and friends, which can be critical for rehabilitation. The Department also has several rules addressing the unique security problems that cell phones create: the cell phone must be contracted through a company licensed with the Federal Communications Commission; calls to pre-paid or pay-as-you-go phones are prohibited; and the cell phone owner must

31

provide a physical billing address. See Fla. Admin. Code r. 33-602.205(2)(a). Because the Department has good reason for not banning all calls to cell phones, while also limiting three-way calls, PLN's argument that the restriction on ads for three-way calls has no rational connection to security and safety interests is unpersuasive.

ii.    Pen Pal Solicitation Ads

Upchurch's testimony shows why the Department's concerns with pen pal solicitation ads are rationally connected to its security and safety interests. He described how those services give inmates opportunities to prey on the public by allowing them to write people they have no connection with, which heightens the risk of fraud. In his experience, giving inmates the opportunity to solicit pen pals resulted in the exploitation of kind-hearted but gullible people. Inmates have been known to borrow or buy from each other pen pal letters that have proven effective in scamming victims. Upchurch explained that such scams are hard to investigate because victims are often embarrassed and prosecutors prefer to focus on criminals on the streets, not those already in prison. And despite the Department's rule prohibiting pen pal solicitation, inmates succeed in posting online profiles with the same companies that advertise in Prison Legal News. Given that evidence, the Department's belief that reducing inmates' exposure to the ads will help ensure compliance with the prohibition on pen pal solicitation is rational.

32

iii.   Cash-for-Stamps Ads

Turning to cash-for-stamps ads, Upchurch testified that the large number and size of those ads in Prison Legal News makes inmates "aware of the opportunity [to break prison rules] where they otherwise might not be." That is enough to establish a rational connection between the ads and the Department's penological interests. See McCorkle v. Johnson, 881 F.2d 993, 995–96 (11th Cir. 1989) (upholding a prison's ban on a satanic bible based on prison officials' testimony that allowing access to it would "only encourage" violent behavior because of the book's teachings about revenge and disobedience). Upchurch also testified that the large number of cash-for-stamps ads in each issue of Prison Legal News shows that the companies are making money off their ads, which evidences that the ads are causing inmates to use those services.[14] The record supports his suspicion, because it shows that over a period of several years a cash-for-stamps exchange company deposited more than $50,000 into the accounts of Florida inmates.

iv.   Prisoner Concierge and People Locator Ads

---

[14] PLN argues that if the Department is worried about the security problems stamps present, then it should just prohibit inmates from keeping stamps altogether instead of allowing them to keep up to 40 stamps at a time. But the Department explained that it allows inmates to keep some stamps so that they can mail letters to family and friends, and switching to a stamp-less system would be costly and impractical. The Department does inspect all outgoing mail, but stamps are easily hidden and the Department processes 50,000 pieces of mail each day. Allowing inmates to have stamps for the legitimate purpose of sending mail to family and friends, while banning ads that tempt them to use stamps for illegitimate purposes, is rational.

33

Finally, Upchurch testified about why ads for prisoner concierge and people locator services threaten prison security and public safety. The problem with prisoner concierge companies is that their services allow inmates to conceal their true identities from the public. Upchurch recounted how some prisoner concierge companies offer photo editing services, which an inmate could use to transform an official prison photo depicting him in a prison uniform into a fake vacation photo depicting him in a bathing suit at the beach. The inmate could then use that fake photo to misrepresent himself to the public, which facilitates fraud. In that and other ways, those ads undermine the Department's ability to control inmates' contact with the public.

The case against ads for people locator services is even more obvious. As Upchurch put it, inmates could use people locator services to "locate judges, lawyers, prosecutors, former witnesses, families of victims," or anyone else "they would have an axe to grind with." He cited the example of a Department inmate who threatened a judge, as well as the example of a prison gang member who after he was released murdered the chief of the Colorado Department of Corrections. As the district court aptly noted, "it doesn't require a JD, or a federal judgeship" to see why people locator services pose a threat.

v.    The "Focus of" or "Prominent or Prevalent" Requirement

34

It is true that Rule (3)(*l*) prohibits only those publications where the rule-defying ads are either the "focus of" the publication or are "prominent or prevalent" throughout it.  Fla. Admin. Code r. 33-501.401(3)(*l*).  PLN asserts that if the ads are as dangerous as the Department makes them out to be, then the Department should impound a publication with even one suspect ad, which it could do.  See Thornburgh, 490 U.S. at 404–05 & n.5, 418–19, 109 S. Ct. at 1877 & n.5, 1884–85 (upholding the facial validity of a prison regulation that allowed a warden to reject a publication based on a single prohibited feature).  Upchurch testified that the Department adopted the "prominent or prevalent" standard to "moderate[ ]" the "focus of" requirement in Rule 3(*l*) and provide "some leeway" to Prison Legal News and other publications with questionable ads.[15]  It did so even though that more moderate approach amounted to "giv[ing] in on some security concerns."  PLN has not convinced us that moderation in pursuit of safety is a constitutional vice.  We do not condemn the Department for permitting more expression than it was required to.[16]

### vi.    Summary of the First Turner Factor

---

[15] Except, for example, publications containing even a single depiction of, or description about, how to manufacture drugs or construct a weapon.  See Fla. Admin. Code r. 33-501.401(3)(a), (c).

[16] PLN, inconsistently, also argues that the Department cannot prohibit a large amount of protected speech based on a few suspect ads.  But the Thornburgh Court upheld the facial validity of regulations doing just that.  See 490 U.S. at 404–05 & n.5, 418–19, 109 S. Ct. at 1877 & n.5, 1884–85.

The record shows that the Department's decision to limit inmates' exposure to the ads is not "so remote" from the Department's security and safety interests "as to render the . . . [impoundments] arbitrary or irrational." Pope, 101 F.3d at 1385. It's not remote at all. There is a rational connection between its impoundments of Prison Legal News based on the magazine's ad content and prison security and public safety interests.

> b.     The Second Turner Factor:  Alternative Means

The second Turner factor is "whether there are alternative means" available to PLN to exercise its right of access to its inmate subscribers. See Turner, 482 U.S. at 90, 107 S. Ct. at 2262. PLN contends that this factor weighs in its favor because the district court found that PLN could not afford to publish its magazine without advertising revenue, and publishing a separate Florida-only version without the rule-defying ads would be cost prohibitive. With those options off the table, PLN argues, the impoundments amount to a blanket ban on its magazine because it has no other way to send Prison Legal News to inmate subscribers in Florida.

It is a close call, but we reject PLN's argument that no alternative means exist here. The Supreme Court has made clear that prisons do not have to provide exact, one-for-one substitutes to provide alternative means. See id. at 92, 107 S. Ct. at 2263 (holding that a prison regulation satisfied this factor because it did not

36

"deprive prisoners of all means of expression," and instead barred "communication only with a limited class of other people with whom prison officials have particular cause to be concerned"). Even if PLN cannot deliver Prison Legal News to its inmate subscribers in Florida, this factor is satisfied as long as there is some other way to exercise its right of access to inmates. See Thornburgh, 490 U.S. at 417–18, 109 S. Ct. at 1884 (stating that the second factor was satisfied even though inmates could not attend a particular Muslim religious ceremony because they could "participate in other Muslim religious ceremonies") (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400 (1987)).

Although PLN cannot publish its magazine without ads and cannot afford to publish a Florida-only version, it can send its other publications to Florida inmates. For example, PLN publishes a handbook called the Prisoners' Guerrilla Handbook, which describes various educational programs for prisoners. The Department does not impound that handbook. PLN also distributes to inmates a variety of books about daily life in prison, incarceration in the United States, and related topics. See Livingston, 683 F.3d at 209–10. There is no indication that those books are impounded.

PLN's argument focuses solely on its ability to send Prison Legal News to Florida inmates, but "adequate alternatives" can exist even "where prisoners [are] cut off from unique and irreplaceable activities." Id. at 219; see also id. at 209,

37

218–19 (concluding that the second factor favored the corrections department, which had banned five of PLN's books in Texas prisons, because the "alternatives left open to PLN to communicate its intended message to [the inmates were] extensive," as it could distribute "countless other books" to inmates).  Sending alternate publications might not be "ideal" for PLN, but Turner does not demand the ideal.  See Yang v. Mo. Dep't of Corr., 833 F.3d 890, 894–95 (8th Cir. 2016) (upholding a prison regulation that prohibited a Chinese inmate from corresponding in Chinese with his Chinese-speaking relatives in China, who did not speak English, because the inmate could still correspond in English, receive visitors, and make domestic and international calls).  The second factor favors the Department or, perhaps more accurately, does not disfavor the Department.

c.    The Third Turner Factor:  Impact of Accommodating the Asserted Right

The "third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  Turner, 482 U.S. at 90, 107 S. Ct. at 2262.

As we've explained, the Department impounded every monthly issue of Prison Legal News during the five-year period for which there is evidence in the record because the magazine's ads give inmates the opportunity to use prohibited services, which creates security problems.  It follows that if the Department admits an issue of the magazine, it would have to allocate more time, money, and

38

personnel in an attempt to detect and prevent security problems engendered by the ads in the magazines.  See Simpson, 879 F.3d at 281 ("Requiring Cape Girardeau to abandon the postcard-only policy would force the jail to dedicate more time and resources to searching the mail, which would detract from the officers' other duties related to security and inmate welfare."); Woods, 652 F.3d at 750 (stating that a ban on pen pal websites passed the third Turner factor because pen pal scams "unduly distract[ed] prison officials from the day-to-day affairs they must manage in order to maintain a safe atmosphere for everyone in the prison environment"). PLN's subscribers could share copies of the magazine and its ads with non-subscribing inmates or spread information by word-of-mouth about the companies offering the prohibited services.  See Thornburgh, 490 U.S. at 412, 109 S. Ct. at 1881 (stating that periodicals "reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct").  As Upchurch testified, that "ripple effect" increases the burden on Department staff. See Turner, 482 U.S. at 90, 107 S. Ct. at 2262 ("When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.") (quotation marks omitted).  The third factor favors the Department.

        d.     The Fourth Turner Factor:  Exaggerated Response

39

The final Turner factor requires us to consider whether the impoundments of Prison Legal News are "an exaggerated response to prison concerns." Id. (quotation marks omitted). The "existence of obvious, easy alternatives may be evidence that the regulation . . . is an exaggerated response" to a problem, while the "absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id. (quotation marks omitted). PLN argues that the Department's decision to impound the magazine is an exaggerated response to its security concerns because no other corrections department in the nation impounds this particular magazine based on its ad content. And it points to several supposedly simple alternatives to impoundment that would alleviate the Department's security concerns: prohibiting inmates from calling out to cell phones, switching to a stamp-less system, or attaching a flyer to each issue of Prison Legal News to remind inmates not to use the prohibited services.

The Department's decision to impound Prison Legal News is not an exaggerated response to its security concerns. Although the "policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction," such policies are not "necessarily controlling." Procunier v. Martinez, 416 U.S. 396, 414 n.14, 94 S. Ct. 1800, 1812 n.14 (1974), overruled on other grounds by Thornburgh, 490 U.S. at 413–14, 109 S. Ct. at 1881–82. "[T]he Supreme Court has made it patently clear that the Constitution

40

does not mandate a lowest common denominator security standard whereby a practice permitted at one penal institution must be permitted at all institutions."[17] Pope, 101 F.3d at 1385; see also Crime Justice & Am., Inc. v. Honea, 876 F.3d 966, 971, 978 & n.6 (9th Cir. 2017) (rejecting the plaintiff's argument that a ban on its magazine coming into a county's jail was an exaggerated response to safety concerns, even though the magazine was "widely distributed at other jails," because the county did not have as much control over the inmates in its jail compared to other counties).  There is no one-size-fits-all approach to prison management.  As Upchurch testified, every institution faces different security problems and deals with those problems in different ways.  For example, some prisons put microwaves in communal inmate living areas, while others would never allow that arrangement out of fear that an inmate would heat up hot water

---

[17] There is no support for PLN's argument that the Department has the burden of showing something unique about its institutions to justify its impoundment decisions.  Cf. Overton, 539 U.S. at 132, 123 S. Ct. at 2168 ("The burden . . . is not on the State to prove the validity of prison regulations but on [the challenger] to disprove it.").  PLN cites Holt v. Hobbs, 574 U.S. ___, 135 S. Ct. 853, 859 (2015), where the Supreme Court held that Arkansas' ban on prisoners having 1/2 inch beards substantially burdened a Muslim inmate's religious exercise.  The Supreme Court observed that most states and the federal government permitted inmates to grow beards of that length, and stated that "when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course . . . ."  Id. at 866.  The Court analyzed that claim under the Religious Land Use and Institutionalized Persons Act, which requires the government to show that its regulation is the least restrictive means of furthering a compelling interest.  Id. at 863.  Turner, by contrast, does not require the Department to use the "least restrictive means" to promote prison security.  Turner, 482 U.S. at 90–91, 107 S. Ct. at 2262.  And even under RLUIPA, a state need not permit an accommodation just because others do.  See Knight v. Thompson, 796 F.3d 1289, 1291, 1293 (11th Cir. 2015) (rejecting the argument that the policies of 39 other prison systems rendered invalid the challenged prison policy).

and use it as a weapon.  Upchurch explained that what matters to the Department is not the policies of corrections departments in other states, but maintaining prison security and public safety.[18]  In his view, the impoundments of Prison Legal News help accomplish those goals.

PLN's proposed alternatives range from bad to worse.  Prohibiting inmates from calling cell phones would make it difficult for them to keep in touch with family and friends (because of the decline in landline use), which in turn would undermine efforts to rehabilitate inmates.  Switching to a stamp-less system would cost $70,000 (to change the Department's banking system), require changing two state statutes, and force the Department to solve the logistical challenge of how inmates could send letters from prison canteens.  See Thornburgh, 490 U.S. at 419, 109 S. Ct. at 1885 (stating that courts must consider the administrative inconvenience of proposed alternatives).

Last and most definitely least, PLN proposes that the Department follow New York's lead and simply attach to each issue of Prison Legal News a flyer reminding inmates not to use the prohibited services.  Really?  If all New York has

---

[18] One reason that the policies of departments in other states do not matter so much is that circumstances vary from state to state.  For example, PLN's evidence shows that the Arizona Department of Corrections does not impound Prison Legal News.  PLN's expert admitted, however, that Arizona's "physical structures and facilities are more secure than" Florida's, which tends "to use dormitories for certain categories of prisoners that many other states would not put in a dormitory."  Because of differences in physical structures and facilities, the Department's security concerns differ from those of Arizona's corrections department.

to do to prevent inmate misconduct and crime is gently remind them not to misbehave, one wonders why that state's prisons have fences and walls. Why not simply post signs reminding inmates not to escape? If New York wants to engage in a fantasy about convicted criminals behaving like model citizens while serving out their sentences, it is free to do so, but the Constitution does not require Florida to join New York in la-la-land. Though it was hardly necessary to state the obvious, Upchurch testified that a reminder flyer on the magazine would not alleviate security concerns. See id. at 419, 109 S. Ct. at 1884–85 ("In our view, when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under Turner."). Like the first three factors, this final factor favors the Department.

### e.    The Turner Factors:  Conclusion

Upchurch summed up the relationship between the impoundment of Prison Legal News and the Department's prison security and public safety interests by stating that those rules "certainly help[ ]" advance those interests. And that's the point. The impoundment of Prison Legal News is not a silver bullet guaranteeing that inmates will not break the rules and commit crimes while incarcerated. But the record shows that a "reasonable relationship" does exist between the

43

Department's decision to impound the magazine and its prison security and public safety interests.  Turner, 482 U.S. at 91, 107 S. Ct. at 2262.  That is all Turner requires.  Id. at 90–91, 107 S. Ct. at 2262.  Because all four Turner factors favor the Department, we hold that the impoundments of Prison Legal News under Rules (3)(*l*) and (3)(m) do not violate the First Amendment.

## B.    Due Process Claim

That the Department's impoundments of Prison Legal News do not violate the First Amendment doesn't let the Department entirely off the constitutional hook.  The district court ruled that the Department violated PLN's right to due process by failing to provide it with notice for each impounded issue, and the court entered an injunction requiring the Department to do that.  That was not an abuse of discretion.

PLN must receive notice and an opportunity to be heard each time the Department impounds an issue of the magazine.  See Perry, 664 F.3d at 1367; Montcalm Publ'g Corp. v. Beck, 80 F.3d 105, 106 (4th Cir. 1996) ("We hold that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers."); Jacklovich v. Simmons, 392 F.3d 420, 433 (10th Cir. 2004) (following Montcalm); see also Londoner v. City and Cty. of Denver, 210 U.S. 373, 385, 28 S. Ct. 708, 714 (1908) ("[D]ue process of law requires that . . . the [party] shall have an

44

opportunity to be heard, of which he must have notice . . . .").[19]  As the district

court ruled, the Admissible Reading Material Rule on its face satisfies those

requirements.  When the Department impounds an issue of a publication, the rule

requires that it send the publisher a notice form listing the "specific reasons" for

the impoundment of that issue.  Fla. Admin. Code r. 33-501.401(8)(b).[20]  The

Literature Review Committee reviews every impoundment decision, id. r. 33-

---

[19] We held in the Perry decision that there is a lower due process standard for mass mailings (that is, bulk correspondence).  664 F.3d at 1368.  We reject the Department's argument that magazines sent to subscribers are mass mailings.  See Montcalm, 80 F.3d at 109 & n.2 (contrasting magazines sent to individual subscribers with mass mailings, which are sent to "each and every inmate at a given institution").  It is also not enough that publishers may receive notice of an impoundment from inmates.  See Jacklovich, 392 F.3d at 433–34 ("[The] publisher's rights must not be dependent on notifying the inmate[,] who in all likelihood will never see the publication . . . .").

[20] PLN and the amici argue that the Department must provide PLN with notice for each individual copy of Prison Legal News that the Department impounds, even if the Department has already sent notice that it has impounded a copy of that same issue sent to another inmate.  In other words, if the Department impounds the January 2018 issue of Prison Legal News and withholds 70 copies of that issue from its inmate subscribers, then PLN wants notice forms for all 70 copies, not just one notice for the January issue.  Due process does not demand that much.  Under the administrative rule, once one facility impounds a monthly issue, every other facility must impound that same issue on the same grounds until the Literature Review Committee can decide whether that issue can be admitted into the prisons.  Id. rr. 33-501.401(8)(c), (14)(a), (14)(c).  Copy-by-copy notice is not necessary for PLN to learn the reason(s) for the impoundment as long as all copies are impounded for the same reason(s).  See Livingston, 683 F.3d at 223 (holding that due process does not require copy-by-copy notice because later "denials of identical publications amount to the routine enforcement of a rule with general applicability").

We also reject PLN's and the amici's argument that it is entitled to more due process protections because of the content of its magazine.  See Shaw, 532 U.S. at 230, 121 S. Ct. at 1480 (rejecting the argument that courts should "enhance constitutional protection [under Turner] based on their assessments of the content of the particular communications").

45

501.401(14)(c), and the publisher can independently appeal an impoundment decision to that committee, id. r. 33-501.401(15)(a).[21]

Those procedures, if applied, would have ensured that for each impounded issue PLN received a notice form listing the reasons for the impoundment. As the Department acknowledges, however, that did not happen for 26 out of the 62 monthly issues (42%) impounded between November 2009 and December 2014. That failure rate increases to 87% when we take into account defective notice forms that did not list the reasons for the impoundment. Despite that remarkable failure rate, the Department argues that the Secretary cannot be enjoined because there is no evidence that the failure to send the forms was a result of a Department policy or custom to deprive PLN of notice.[22] The Department asserts that PLN should find the mailroom workers who are responsible for the failure to provide notice and sue them. No.

---

[21] PLN argues that when the committee reviews an impoundment decision it cannot reasonably gauge whether ads are "prominent or prevalent" in the magazine because it receives only a publication's front cover and a copy of the pages with problematic content. Fla. Admin. Code r. 33-501.401(8)(b). That argument fails because publishers must send a copy of the entire impounded issue when the publisher files its own appeal with the committee. Id. r. 33-501.401(15)(a)(2).

[22] The Department argues that PLN did not receive the required notice because of negligent mailroom staff, and that the negligent deprivation of notice cannot give rise to a procedural due process violation. Cf. Jones v. Salt Lake County, 503 F.3d 1147, 1162–63 (10th Cir. 2007) (concluding that PLN's due process claim failed where a prison's mailroom staff negligently failed to deliver the magazine to inmate subscribers). But the Department deliberately impounded Prison Legal News, which means that it had to provide notice to PLN for each impounded issue.

46

PLN doesn't have to hunt and peck throughout Florida's correctional system for negligent mailroom workers to sue. The buck stops with the Secretary. See Fla. Stat. § 20.315(3) ("The head of the Department of Corrections is the Secretary of Corrections. . . . The secretary shall ensure that the programs and services of the department are administered in accordance with state and federal laws, rules, and regulations . . . ."). This is not a case of one or two notice letters lost in the mail or mailroom. PLN did not receive notice forms for 42% of the impounded issues, and many forms it received for other issues were defective. PLN's effort to enjoin the ongoing violation of its right to due process is appropriate, and it seeks only prospective relief against the Department. See Friends of Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1215 (11th Cir. 2009) (stating that the Ex Parte Young doctrine permits "lawsuits against state officials as long as the plaintiffs seek only prospective injunctive relief to stop ongoing violations of federal law"). And as the district court pointed out, its injunction "essentially requires compliance with the [Department's] own rule." The Secretary should not protest too loudly an order to enforce a rule she is statutorily required to enforce. See Fla. Stat. § 20.315(3).

## IV.    CONCLUSION

The Department's concerns with the ads in Prison Legal News are reasonably related to its legitimate interests in prison security and public safety, so

47

we defer to its decision and hold that the impoundments of <u>Prison Legal News</u> under Rules (3)(*l*) and 3(m) do not violate the First Amendment.  But with the power to impound <u>Prison Legal News</u> comes the duty to inform PLN of the reasons for the impoundments.  The Department did not do that, which is why the district court did not abuse its discretion in entering an injunction to require the Department to adhere to its own notice rules.

**AFFIRMED.**

48